IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TIMOTHY DAVIS, | : | |
| | : | Case No. 2:17-cv-823 |
| Plaintiff, | : | |
| | : | CHIEF JUDGE ALGENON L. MARBLEY |
| v. | : | |
| | : | Magistrate Judge Chelsey M. Vascura |
| CITY OF COLUMBUS, OHIO, *et al.*, | : | |
| | : | |
| Defendants. | : | |

**OPINION & ORDER**

This matter comes before the Court on Defendant City of Columbus's Motion for Summary Judgment. (ECF No. 72). The Court held oral argument on this motion on June 17, 2021, at 10:00 a.m. For the reasons set forth below and orally on the record, this Court **DENIES** Defendant City of Columbus's Motion for Summary Judgment.

**I.  BACKGROUND**

This is a federal civil rights action arising out of the September 1, 2017 arrest of Plaintiff Timothy Davis at the Livingston Market in Columbus, Ohio. (ECF No. 26 ¶ 1). Defendants Matthew Baker, Alan Bennett, Sean Connair, Eric Everhart, Anthony Johnson, LeVon Morefield, Robert Reffitt, and Ryan Steele are Law Enforcement Officers with the Columbus Division of Police ("CPD"). (ECF No. 72 at 1). Each of the Officers was involved personally in Mr. Davis's September 1 arrest, and each of the Officers applied force to effect that arrest. (*Id.*). The use of force included physical blows to Mr. Davis's face and torso, as well as repeated tasing. (ECF No. 26 ¶¶ 27, 35). Mr. Davis alleges that the force used to accomplish his arrest was excessive and in violation of his Fourth Amendment rights. (*Id.* ¶ 67).

### A. Columbus Division of Police

The Violent Crime Working Group ("Working Group") was a former directed patrol unit created in 2017 to apprehend "most wanted" individuals with felony warrants in CPD's Zone 5. (ECF No. 83 at 4, 27 (citing Hasson Dep.)). The Working Group carried out Mr. Davis's arrest, and all but two of the Defendant Officers were members of it.[1] Mr. Davis alleges that the Working Group maintained no criteria to join, lacked specialized training, and was composed of patrol officers who volunteered for the assignment. (ECF No. 83 at 11 (citing Hasson Dep., Reffitt Dep.)). Mr. Davis also states that no supervisory officer oversaw the team's day-to-day assignments or tactical decisions. (*Id.* at 12 (citing Hasson Dep., Connair Dep., Morefield Dep.)). A Lieutenant was the *de facto* supervisor, but he simply oversaw administrative tasks like scheduling. (*Id.* at 11 (citing Hasson Dep., Connair Dep.)). The only reporting required of the patrol officers in the group was *ex post* reporting of the arrests made, submitted to that same Lieutenant on an irregular basis. (*Id.* at 12, 28 (citing Hasson Dep.)).

Defendant City of Columbus supports its Motion by detailing the training all CPD officers are required to undergo. (ECF No. 72 at 10). This training includes a six-month, 1,000-hour basic recruit training program, which exceeds Ohio's requirements for basic law enforcement training. (*Id.*). After basic training, new CPD officers also must complete the Division's Field Officer Training, where they spend about fifteen weeks going through one-on-one training with veteran officers. (*Id.*).

In addition, the City highlights CPD's use of force policy, codified as Directive 2.01, which prohibits officers from using "more force than is reasonable in a particular incident." (*Id.* at 15). Before exerting force, officers are instructed to consider: (1) the "severity of the crime at issue";

---

[1] Officers Bennett and Steele were uniformed patrol officers, not affiliated with the Working Group, who arrived on the scene after the Working Group Officers initiated the arrest. (ECF No. 65-2 ¶¶ 6, 9–11; ECF No. 65-9 ¶¶ 6, 30).

(2) whether the "suspect poses an immediate threat to the safety of the officer or others"; (3) whether the "suspect is actively resisting arrest"; and (4) whether the "suspect is attempting to evade arrest by flight." (*Id.*).

The use of tasers by CPD officers is governed by Directive 2.04. The policy directs that tasers are intended to incapacitate a "violent or potentially violent" subject's neuromuscular and sensory nervous system, or to elicit pain compliance via an electrical current. (ECF No. 83 at 13 (citing Directive 2.04 & Van Dop Dep.)). CPD patrol officers undergo taser training annually. Officers are trained to "[u]se the shortest duration of . . . exposure objectively reasonable to accomplish lawful objectives, and reassess the subject's behavior before initiating or continuing the exposure." (*Id.* at 15 (citing Selected Taser Training Slides)). Further, officers are instructed that extended use of tasers can "be avoided or reduced by 'controlling/cuffing under power,'" which refers to the practice of handcuffing a subject during or immediately following the use of a taser. (*Id.*).

Mr. Davis notes that the City's taser policy does not provide guidance as to the maximum number of cycles an officer is permitted to use once he has deployed the taser, nor does it address when multiple deployments are warranted, reasonable, or safe. (*Id.* at 14 (citing Vehr Expert Dep.)). Put differently, he alleges inadequate training on the cumulative risk of prolonged or repeated exposure to tasing. (*Id.* at 21–22 (citing Bennett Dep., Taylor Dep.)).

### B. Mr. Davis's September 1, 2017 Arrest

Mr. Davis was on the Working Group's "most wanted" list because he had outstanding misdemeanor and felony warrants in Ohio and Kentucky, as well as a previous conviction for aggravated robbery and kidnapping. (ECF No. 72 at 2–3). The Working Group Officers knew of prior incidents where Mr. Davis had assaulted a CPD officer and a Kentucky state trooper. (*Id.*).

3

To locate and arrest Mr. Davis, Officer Morefield was tracking him on Facebook. (*Id.* at 3). On September 1, 2017, Mr. Davis posted an offer on Facebook to "jailbreak" Amazon Firesticks. (*Id.*). Officer Morefield, posing as a civilian woman, responded to Mr. Davis's post that (s)he was interested in the offer. Through the conversation, Officer Morefield learned that Mr. Davis would be at Livingston Market later that day. (*Id.*).

When the Working Group Officers learned that Mr. Davis would be at Livingston Market, they divided into two teams in separate vehicles. (ECF No. 72 at 4). After purchasing a few items, Mr. Davis states that he looked to see if the woman had arrived but saw no cars in the parking lot. (ECF No. 83 at 3). The Officers, however, had seen him. The first group—those wearing black tactical vests that read "POLICE" in large white lettering on the front and back—went into the market first. The other Working Group Officers followed. (ECF No. 72 at 4).

There is substantial disagreement as to the circumstances of Mr. Davis's arrest. The City describes Mr. Davis's "active, vigorous, long-lasting resistance." (*Id.* at 5). Mr. Davis pleads that he did nothing to resist arrest and that the Officers exerted unreasonable force by punching, kicking, and tasing him. (ECF No. 26 ¶¶ 28, 37). Mr. Davis recalls that he was punched on the left side of his face without warning by a person he perceived to be a stranger in a black hoodie. (ECF No. 83 at 1). Mr. Davis describes being "bull-rushed" by a group he did not perceive as police officers but later learned were Officers Morefield, Johnson, Everhart, and Connair. (*Id.*). Rather than informing Mr. Davis he was under arrest, the four Officers proceeded to punch and beat him, he alleges. (*Id.* (citing video evidence)). The Officers' use of force report and testimony indicate at least seven elbow strikes, five knee strikes, nine kicks, five punches each to the face and back, two punches to the ribs using handcuffs, hair pulling, and eleven taser cycles on a close-quarter probe deployment and drive-stun mode. (*Id.* at 2). At some point, Mr. Davis says that his pants

4

came down and exposed his genitals. (*Id.* (citing video evidence)). Mr. Davis claims also that an Officer placed him in a headlock and stated: "Watch out buddy, you're about to go to sleep." (*Id.* at 6 (citing video evidence)).

Bystanders recorded at least some of the arrest. One such bystander, Michael Woodson-Levey, testified that he did not hear any voices identifying the Officers as CPD or instructing Mr. Davis that he was under arrest. (*Id.* at 4 (citing Woodson-Levey Dep.)). Mr. Woodson-Levey did hear the Officers command Mr. Davis to "stop resisting," but not until after they had been "tussling" with Mr. Davis for some time. (*Id.*). Mr. Woodson-Levey never observed Mr. Davis engage in any aggressive behavior, physically or otherwise. (*Id.*).

Mr. Davis alleges that Officers Connair and Johnson performed separate takedowns to bring him to the ground, where the Officers continued to strike, punch, kick, and stomp on him. (*Id.* at 5–6, 7 (citing Connair Use of Force Rep., Johnson Dep., & video evidence)). An Officer can be heard on video saying: "Put your hands behind your back, bitch." (*Id*. at 8).

As Officer Bennett arrived, the other Officers directed him to "tase the motherfucker." (*Id.* (citing video evidence)). Officer Bennett tased Mr. Davis eleven times. Mr. Davis was subjected to a total of fifty-five seconds of tasing, all of which occurred over the course of one minute and twenty-eight seconds. (*Id.* at 9 (citing Bennett Taser Rep.)).

Eventually, Mr. Davis was placed in handcuffs and arrested. In the transport van, Mr. Davis remembers fading in and out of consciousness (*Id.* at 10). Mr. Davis claims he told an Officer, "I can't breathe," to which the Officer responded: "Oh, stop it. Well then maybe you shouldn't have fought like an asshole." (*Id.* (citing video evidence)). A video at the police station shows Mr. Davis being carried inside, bloodied, hogtied, and seemingly unconscious. (*Id.* at 2).

5

Mr. Davis suffered from multiple abrasions, contusions, and lacerations. He required five days of inpatient treatment at Grant Hospital. (*Id.* at 11 (citing hospital and jail medical records)). Staff at the hospital found blood in both of Mr. Davis's ear canals and damage to his sinuses. He also was diagnosed with acute kidney failure. (*Id.*). Mr. Davis continued to experience rib pain and trouble breathing for months, ultimately leading to diagnosis of a broken rib. (*Id.*).

### C. CPD Investigation

After Mr. Davis's arrest, CPD completed a "Use of Force Report" and later an "Internal Affairs Investigative Summary." (ECF No. 68-10; ECF No. 68-11). Both involved investigating witnesses and reviewing the video footage. (ECF No. 86 at 13–14). The use of force report found that none of the Officers violated CPD policy. It further observed that CPD's use of force policy closely tracks the Supreme Court's objective reasonableness test in *Graham v. Connor*, 490 U.S. 386 (1989), indicating its constitutionality. (ECF No. 72 at 14). The Internal Affairs investigation sustained one allegation of excessive force (by Officer Reffitt), but the Deputy Chief overturned it. (ECF No. 83 at 32 (citing Bash Rep.)). Only the use of profanity was deemed out of policy. (*Id.* (citing Echenrode Mem.)).

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 716–17 (6th Cir. 2012). The Court's purpose in considering a summary judgment motion is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists if the Court finds a jury could return

a verdict, based on "sufficient evidence," in favor of the nonmovant; evidence that is "merely colorable" or "not significantly probative" will not defeat summary judgment. *Id.* at 249–50.

The party seeking summary judgment shoulders the initial burden of presenting the Court with law and argument in support of its motion, as well as identifying the relevant portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation omitted). If this initial burden is satisfied, the burden then shifts to the nonmovant to set forth specific facts showing that there is a genuine issue for trial. *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

In considering the factual allegations and evidence presented in a motion for summary judgment, the Court "views factual evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). Even so, "[t]he mere existence of a scintilla of evidence to support [the nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Anderson*, 477 U.S. at 251.

### III. LAW & ANALYSIS

The parties have stipulated to the dismissal of some of Mr. Davis's original claims. (ECF No. 64; ECF No. 71). The remaining federal claims arise under 42 U.S.C. § 1983 and allege that each of the Officers violated Mr. Davis's Fourth Amendment right to be free from excessive force. Mr. Davis also asserts a federal claim under 42 U.S.C. § 1983 against the City. (ECF No. 26 ¶¶ 67–68). The City moves for summary judgment on the claims against it. (ECF No. 72 at 3).[2]

---

[2] The City recognizes that its arguments also bear on Mr. Davis's official capacity claims against the Officers, insofar as official capacity claims are treated as actions against the government employer. (ECF No. 72 at 18).

## A. Municipal Liability Under Section 1983

Mr. Davis seeks relief for excessive force by his arresting Officers, in violation of his constitutional rights and 42 U.S.C. § 1983. Section 1983 creates a civil cause of action for deprivation of federal rights by any person acting under color of law; but it does not establish full *respondeat superior* liability for actions of municipal employees. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978). Rather, the employee's action must "fairly be said to represent official policy" of the local government. *Id.* at 694.

To prevail on a Section 1983 claim, an aggrieved party first must have suffered a constitutional injury. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). The City assumes, for purposes of this motion only, that Mr. Davis has met the injury requirement and that the Officers did violate his Fourth Amendment rights. (ECF No. 72 at 7).

Municipal liability for such an injury attaches in any of four ways. "[T]he plaintiff may prove: '(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.'" *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019) (quoting *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)).

Whichever of the four routes is taken, "a plaintiff must demonstrate a close causal connection between the policy and the injuries suffered as well." *Johnson v. Hardin Cty.*, 908 F.2d 1280, 1285 (6th Cir. 1990). In other words, "the municipal action [must be] the moving force behind the injury of which the plaintiff complains." *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 405 (1997).[3]

---

[3] The City proposes another "essential element," drawn from its reading of the caselaw: "a sufficient culpable mental state on the part of the municipality itself with respect to that [improper] policy or custom." (ECF No. 72 at 6–7).

8

The City moves for summary judgment, stating that Mr. Davis's claims against it fail on all four *Monell* theories. The Court will review each in turn below. The question at the summary judgment phase is whether Mr. Davis has produced sufficient evidence for a reasonable jury to find in his favor.

### B. *Monell* Theories

#### 1. Illegal Official Policy

When proceeding under the first *Monell* theory of liability, a plaintiff can show that there were "formal rules or understandings—often but not always committed to writing—that [were] intended to, and [did], establish fixed plans of action to be followed under similar circumstances consistently and over time." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986). Because liability extends to understandings in addition to written policies, "a city may be liable under *Monell* for a policy of permitting constitutional violations regardless of whether the policy is written." *Wright v. City of Euclid*, 962 F.3d 852, 880 (6th Cir. 2020) (internal quotation omitted); *see also Monell*, 436 U.S. at 691 ("Although not authorized by written law, such practices . . . could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law.") (internal quotation omitted). Mr. Davis's case implicates the written taser policy and, more importantly, the gaps therein.

The City maintains that Mr. Davis cannot identify any legislative enactment or official policy that directs, allows, or encourages CPD officers to use excessive force. (ECF No. 72 at 15). CPD does have general directives to limit force to what is "reasonable in a particular incident," as

---

However, the case that the City cites for this proposition, *Brown*, makes clear that "Section 1983 itself 'contains no state-of-mind requirement independent of that necessary to state a violation' of the underlying federal right." 520 U.S. 397, 405 (1997) (quoting *Daniels v. Williams*, 474 U.S. 327, 330 (1986)). The "culpability" element proposed by the City is subsumed by either (1) the "intentional[ity]" inherent in a claim under *Monell* theories one and two, *see id.*; or (2) the "deliberate indifference" aspect of a claim under *Monell* theories three and four. *See id.* at 406–07. In short, if Mr. Davis sets forth a complete claim under a *Monell* theory, he also has established culpability.

guided by the Supreme Court's objective reasonableness test in *Graham*, 490 U.S. 386. (ECF No. 72 at 15 (quoting Directive 2.01)). But it is not this general directive that Mr. Davis challenges as allowing excessive force. Mr. Davis points to CPD's taser policy, memorialized in Directive 2.04. While the taser policy does contain general directions to minimize the number and duration of exposures and to evaluate the objective reasonableness of each trigger pull, (*Id.* at 15–16; ECF No. 86 at 2), it fails to include any guidance as to the maximum number of cycles an officer is permitted to use once he has deployed his taser or to provide a benchmark of reasonableness for officers to reference. (ECF No. 83 at 13 (citing Vehr Expert Dep.)). Again, Mr. Davis is challenging the gap in specific guidance, not the overarching principles that police officers are asked to apply.

Mr. Davis's injuries cast doubt on CPD's choice to forego any firm benchmark on repeated taser use. He has produced expert evidence that his prolonged exposure risked serious injury or death and, as such, was "outside of professional law enforcement standards." (*Id.* at 16 (citing Taylor Expert Rep.)). Yet CPD's investigations found no violation of Directive 2.01, Directive 2.04, or any other excessive force rule; on the contrary, they concluded that Mr. Davis's treatment was permitted by CPD policy. (*Id.* at 23). Mr. Davis has identified a report of the Police Executive Research Forum and a Sixth Circuit decision that potentially put CPD on notice of deficiencies in its taser policy years before the arrest. (*Id.* at 22 (discussing 2011 PERF Electronic Control Weapon Guidelines and *Goodwin v. City of Painesville*, 781 F.3d 314 (6th Cir. 2015))).[4] And he has deposed the Officers involved to confirm that the taser policy did not define when exposure

---

[4] The PERF policy guidelines stated that multiple taser applications resulting in "exposure longer than 15 seconds (whether continuous or cumulative) may increase the risk of serious injury or death and should be avoided." (ECF No. 83 at 22). The *Goodwin* decision held a continuous 26-second taser application to be unreasonable. (*Id.*). Mr. Davis was subjected to 55 seconds of tasing in near-continuous fashion, with as little as 1 to 3 seconds between most of the 5-second cycles. (*Id.* at 9 (citing Bennett Taser Rep.)).

becomes extended or repeated so as to violate the general rules on excessive force. (*Id.* at 21 (citing Bennett Dep.)).

This Court finds that Mr. Davis has produced sufficient evidence such that a reasonable jury could find CPD's taser policy deficient and permissive of excessive force. At this stage, Mr. Davis also is entitled to the reasonable inference that an adequate taser policy would have been followed by the Officers who arrested him, such that the policy deficiency may be considered the moving force behind his injuries.

## 2. Ratification

A plaintiff also can establish municipal liability by showing that the municipality ratified the acts of its employees through failing to investigate meaningfully and to punish allegations of unconstitutional conduct. *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1247–48 (6th Cir. 1989). The Sixth Circuit has cautioned, however, that "mere acquiescence in a single discretionary decision by a subordinate is not sufficient to show ratification. Otherwise, [a municipality] would be liable for all of the discretionary decisions of its employees, and this would be indistinguishable from *respondeat superior* liability." *Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). Instead, ratification "requires affirmative approval of a particular decision made by a subordinate." *Id.*

First, Mr. Davis states that CPD's investigations into the Officers' use of force ended with affirmative approval of their actions in Mr. Davis's arrest. (ECF No. 83 at 32). Even the lone use of force initially deemed unreasonable by Sergeant Johnson's investigation was overturned and, as was the case with all other allegations of force against Mr. Davis, approved by a final policymaker, the Police Chief. (*Id.*). *See also Wright v. City of Canton*, 138 F. Supp. 2d 955, 966 (N.D. Ohio Apr. 9, 2001) ("Under Ohio Revised Code § 737.12, the chief of police is the final

policymaker with respect to investigations that do not result in disciplinary action."). The only conduct CPD supervisors deemed "out of policy" and subject to discipline was the profanity the Officers uttered during the arrest. (ECF No. 83 at 32 (citing Echenrode Mem.)). Mr. Davis has cast doubt on the thoroughness and objectivity of the investigations by noting that several of the eyewitnesses offered by the Officers to support their account later testified in favor of Mr. Davis's version of events. (*Id.* at 34–35 (citing Alzeban Dep., Woodson-Levey Dep.)). He also has suggested that the investigations ignored the cumulative effects of the Officers' force and failed to press Officer Bennett for the justification behind each additional trigger pull. (*Id.* at 35–36 (citing Van Dop Mem. & Bennett Dep.)).

The City views Mr. Davis's theory as nothing more than a post-hoc rationalization. It argues that an investigation occurring after the fact cannot be a moving force in causing the constitutional violation. (ECF No. 72 at 14). The question, however, is not whether the ratification caused the injury. It is whether the misconduct that caused the injury was ratified through a failure to investigate, such that it may be considered official policy. *See Wright*, 138 F. Supp. 2d at 966 (citing *Leach*, 891 F.2d 1241). There is no dispute that the City's investigations found no wrongdoing by the Officers and confirmed that the use of force against Mr. Davis was consistent with CPD policy. Moreover, the officials who received and accepted the reports were not mere factfinders, as the City argues. (ECF No. 86 at 12). The officials were making decisions on whether the Officers' conduct fell withing CPD policy and whether the Officers should face potential discipline. *See Wright*, 138 F. Supp. 2d at 966 (finding the police chief to be a "final policymaker" with respect to investigations).

Second, Mr. Davis points to CPD's history of investigations as evidence of a custom or practice of ratifying unconstitutional conduct, including in his case. He presents evidence of

numerous excessive force complaints filed against some of the Working Group Officers—twelve against Officer Johnson and twenty against Officer Connair—that without fail were resolved in favor of the Officers. (*Id.* at 33 (citing reports of CPD Internal Affairs Bureau)). This history of inadequate discipline, Mr. Davis argues, was another moving force behind his constitutional injury. (*Id.* at 36).

The City retorts that since these investigations found no wrongdoing, Mr. Davis has failed to show prior unconstitutional uses of force. (ECF No. 86 at 12). This argument is self-fulfilling, given that Mr. Davis is challenging the legitimacy of those investigations. The large number of complaints—and their unanimous disposition in favor of the Officers—together permit a reasonable inference that there were at least some instances of actual wrongdoing that went unpunished and even were approved.[5] At this stage, such inferences are to be drawn in favor of Mr. Davis.

Accordingly, this Court finds that there is a genuine issue of material fact as to whether an official with final policymaking authority ratified unconstitutional conduct in Mr. Davis's arrest, particularly by failing to investigate fully and to punish adequately those individuals responsible for the use of excessive force.

### 3. Inadequate Training or Supervision

Inadequate police training or supervision may serve as the basis for Section 1983 liability "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). The Supreme Court in *City of Canton* indicated that failure to provide adequate training justifies a finding of

---

[5] To support this inference, Mr. Davis's Amended Complaint acknowledges the City's 1999 pattern or practice investigation by the Department of Justice, which resulted in a finding that the City had tolerated excessive force through inadequate training, supervision, investigation, and discipline of police officers. (ECF No. 26 ¶ 61). What weight to give this investigation is a matter for the jury.

13

deliberate indifference where there are foreseeable serious consequences from the lack of instruction. *Id.* at 390. Liability can attach from a single violation,[6] in which case the Sixth Circuit has held that the training must be "'so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result.'" *Harvey v. Campbell Cty.*, 453 F. App'x 557, 567 (6th Cir. 2011) (quoting *Hays v. Jefferson Cty.*, 668 F.2d 869, 874 (6th Cir. 1982)). And as with the other theories under *Monell*, liability for inadequate training or supervision attaches only where municipal policies are the moving force behind the constitutional violation.

In summary, to succeed on an inadequate training claim, a plaintiff must prove: "(1) that a training program is inadequate to the tasks that the officers must perform; (2) that the inadequacy is the result of the City's deliberate indifference; and (3) that the inadequacy is closely related to or actually caused the plaintiff's injury." *Brown v. Chapman*, 814 F.3d 447, 463 (6th Cir. 2016) (internal quotation omitted). The Court will review those elements below.

*(a) Inadequacy of Training or Supervision*

The City argues that the training and supervision of its police officers was neither lacking nor inadequate. (ECF No. 72 at 9). On the contrary, the City contends that CPD thoroughly trained and supervised its officers on the use of force. (*Id.*). In support, the City details the extensive training required of all would-be CPD officers and highlights CPD's ongoing training program after hiring—both of which meet or exceed the standards established by the State and for accreditation. (*Id.* at 10). The City argues that Mr. Davis makes only general allegations of

---

[6] Another situation justifying a conclusion of deliberate indifference is where the city fails to act in response to a pattern of constitutional violations by its officers. *See Brown*, 520 U.S. at 407–08. It does not appear that Mr. Davis alleges these circumstances. References to any pattern of violations in Mr. Davis' opposition to summary judgment are under the ratification theory of *Monell* liability. (ECF No. 83 at 31–37).

14

purportedly deficient training, rather than pointing to any specific deficiencies or inadequacies in CPD's use of force training or supervision. (*Id.*).

In fact, Mr. Davis highlights four categories of training and supervision that he believes were inadequate. First, Mr. Davis notes the absence of specialized training for the Working Group. The mission of the Working Group was to apprehend "most wanted" individuals with outstanding arrest warrants for violent felonies. (*Id.* at 2). Yet Mr. Davis states, and the Officers corroborate, that CPD provided no specialized training or instruction, beyond the CPD basic training, on how to accomplish these arrests safely and legally. (ECF No. 83 at 27 (citing Hasson Dep.)).

Second, Mr. Davis alleges that supervision of the Working Group broke from established protocols. At the time of Mr. Davis's arrest, the CPD Supervisor's Manual included a policy (1.00) titled "Command and Administrative Decision Levels," which states that certain tactical decisions are not to be made at any level lower than Sergeant. (*Id.*). But Mr. Davis has established a record rife with evidence that Officer Everhart, a patrol officer, routinely was making tactical decisions for the Working Group. (*Id.* at 27–28 (citing Hasson Dep., Connair Dep., Morefield Dep.)). And the record does not show that the Working Group Officers consulted with supervisors for tactical advice. (*Id.* at 29). All of this was known to the higher levels of command, but the structure persisted until after Mr. Davis's arrest. (*Id.* at 12, 31 (citing Hasson Dep.)).

Third, Mr. Davis refers back to the inappropriate use of tasers, noting that CPD officers are not trained on how to limit extended use of a taser. Mr. Davis procured testimony from Officer Bennett that he was not trained on how to determine the appropriateness of using multiple taser cycles. (*Id.* at 25 (citing Bennett Dep.)). Defendants' expert corroborated that decisions about the number of cycles are left to officers in the field. (*Id.* at 26 (citing Vehr Expert Dep.)).

15

Fourth, Mr. Davis alleges that the Working Group failed to review or monitor internally its Officers' conduct. Rather, the Working Group Officers continued to report to chains of command in their originating divisions, which resulted in their uses of force being reviewed by separate outside supervisors. (*Id.* at 12 (citing Hasson Dep.)). Only after Mr. Davis's arrest was a supervisory officer added to the Working Group. (*Id.*).

Accordingly, Mr. Davis has created a genuine issue of material fact as to whether CPD's training and supervision was adequate for the tasks to be performed. It is for the jury to determine whether the baseline CPD training and looser chain of command were adequate to meet the Working Group's mission of apprehending known violent felons. The same is true for whether the general use of force directives were sufficient to avoid excessive use of repeated taser cycles.

### (b) Deliberate Indifference

A municipality can be found deliberately indifferent in its training or supervision through "'a single violation of federal rights, accompanied by a showing that [the municipality] has failed to train its employees to handle recurring situations presenting an obvious potential' for a constitutional violation." *Shadrick v. Hopkins Cty.*, 805 F.3d 724, 739 (6th Cir. 2015) (quoting *Brown*, 520 U.S. at 409). This method of proving deliberate indifference towards inadequate training is available "'in a narrow range of circumstances' where a federal rights violation 'may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations.'" *Id.* (alteration in original) (quoting *Brown*, 520 U.S. at 409).

Mr. Davis alleges that CPD did not provide any specialized training to its Working Group Officers regarding excessive force when apprehending potentially violent suspects. (ECF No. 83 at 27 (citing Hasson Dep.)). The Working Group was composed of volunteer recruits, without any requirements to join. (ECF No. 83 at 11 (citing Reffitt Dep., Hasson Dep.)). And though all CPD

16

officers receive basic training on the proper use of force, including with a taser (ECF No. 72 at 9–10), these Working Group Officers would be engaging repeatedly in arrests likely to require greater than usual force. In light of the Working Group's mission to apprehend suspects with active warrants for violent felonies, a reasonable jury could find that the lack of any specialized training indicates deliberate indifference under *City of Canton* and its progeny. *See City of Canton*, 489 U.S. at 390 ("[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."). The allegations here also illustrate notice as to deficiencies in the taser training (ECF No. 83 at 22) and a foreseeable risk of rendering a suspect unable to comply with commands, thereby prompting the officer to continue tasing a suspect beyond justifiable limits. (*Id.* at 24).

With regard to supervision, the Working Group was composed of volunteers who were not answerable to anyone other than their regular patrol supervisors, who had limited insight on Working Group activities. Mr. Davis states that the Working Group Officers were placed in a disjointed chain of command whereby Lieutenant Hasson was the *de facto* "supervisor," but only for administrative matters. (ECF No. 83 at 11, 27 (citing Hasson Dep., Connair Dep.)). This arrangement meant that review was accomplished by multiple chains of external officers, but none internal to the Working Group. (*Id.* at 12, 27 (citing Hasson Dep.)). Given the dearth of direct supervision and review, a jury reasonably could find deliberate indifference, premised again upon foreseeable consequences. *Cf. Ouza v. City of Dearborn Heights*, 969 F.3d 265, 289 (6th Cir. 2020) (failure to evaluate, review, or monitor police officers' conduct could amount to deliberate indifference).

*(c) Causation*

A plaintiff finally must prove "that the inadequacy is closely related to or actually caused the plaintiff's injury." *Plinton v. Cty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008) (internal quotation omitted). The "closely related to" and "actually caused" phrases come from *City of Canton*. This is a higher standard than "be[ing] able to point to something the city 'could have done' to prevent the unfortunate incident," which "virtually every" plaintiff under Section 1983 will be able to do. *City of Canton*, 489 U.S. at 392.

Mr. Davis argues there is causation between CPD's training and the injuries he sustained. The taser policy does not mandate a limit or provide a definition of "prolonged exposure" to a taser. Nor does CPD training provide guidance as to when repeated tasering is considered unsafe or high-risk to the subject. (ECF No. 83 at 14 (citing Vehr Expert Dep., Van Dop Dep.)). Here, Officer Bennett allegedly applied the taser to Mr. Davis almost continuously for a minute and a half, even though Mr. Davis represents that he was not resisting arrest and that the taser already had produced the desired effect of submission. (*Id.* at 20). Additionally, the Working Group Officers received no use of force training above basic CPD requirements, despite their specialized mission making it particularly likely that these Officers would use higher levels of force. At this stage, Mr. Davis is entitled to an inference that, had the Officers been trained properly on use of force generally and prolonged taser use specifically, the constitutional injury would have been avoided.

Mr. Davis's expert, having evaluated the Working Group's supervision practices, also found causation from the irregular chain of command. The expert concluded that the absence of a supervisor resulted in a poor arrest plan where bystanders would be at risk, giving cover for additional force to be used against Mr. Davis. (*Id.* at 28–29 (citing Taylor Expert Rep.)).

18

This Court finds that there is a genuine issue of material fact as to whether CPD's training or supervision was a moving force in Mr. Davis's constitutional injuries. *See also Brown*, 520 U.S. at 409–10 (holding that a "high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable"); *Ouza*, 969 F.3d 265 at 289 (same).

In summary, Mr. Davis has raised serious questions about the adequacy of CPD's training and supervision on use of force. If the inadequacies are proven, it likely was foreseeable that they would result in constitutional violations. Accordingly, this Court finds that Mr. Davis's *Monell* claims for inadequate training and supervision also must survive summary judgment.

### 4. *Custom of Tolerance or Acquiescence of Federal Rights Violations*

Lastly, a plaintiff may plead municipal liability under *Monell* by demonstrating the existence of a custom of tolerance or acquiescence to the violation of constitutional rights. The Sixth Circuit has identified four factors that a plaintiff must prove in order to establish a custom of tolerance or acquiescence: "(1) the existence of a clear and persistent pattern of illegal activity; (2) notice or constructive notice on the part of the defendant; (3) the defendant's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the defendant's custom was the moving force or direct causal link in the constitutional deprivation." *Stanfield v. Lima*, 727 F. App'x 841, 851 (6th Cir. 2018) (internal quotation omitted). Failure to investigate can constitute a custom of tolerance rising to the level of deliberate indifference. *See Leach*, 891 F.2d at 1247–48.

Mr. Davis's custom theory overlaps with his ratification theory, wherein he argues that the history of superficial investigations into unconstitutional use of force demonstrates a practice of ratifying unconstitutional conduct. (ECF No. 83 at 32–34). Mr. Davis identifies the 1999

19

Department of Justice investigation (ECF No. 26 ¶ 61) and the history of complaints against several Officers involved in his arrest (ECF No. 83 at 33) as putative proof of a clear pattern of inadequate investigation into excessive force. The federal investigation would have put the City on notice, as would the citizen complaints about the Officers. In accepting the investigatory reports and their findings, the City would have given tacit approval to officers' misconduct. And a jury reasonably could conclude that the pattern of inadequate investigation allowed officers—including those who arrested Mr. Davis—to perpetuate misconduct without fear of discipline, such that causation is satisfied. Consistent with the analysis in Section III.B.2, *supra*, this Court finds that a lack of meaningful investigations into unconstitutional use of force would permit a reasonable jury to find a custom of tolerance or acquiescence in CPD towards the same.

## IV. CONCLUSION

For the reasons set forth above, this Court **DENIES** Defendant City of Columbus's Motion for Summary Judgment (ECF No. 72).

**IT IS SO ORDERED.**

_____
**ALGENON L. MARBLEY
CHIEF UNITED STATES DISTRICT JUDGE**

**DATED: September 27, 2021**