UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

TIMOTHY DAVIS,                     )
                                   )
  PLAINTIFF,                       )     CASE NO. 2:17-CV-823
                                   )
        vs.                        )
                                   )
CITY OF COLUMBUS, et al.,          )
                                   )
  DEFENDANTS.                      )
_____ )


TRANSCRIPT OF EXCERPT OF JURY TRIAL PROCEEDINGS
**TESTIMONY OF LEVON MOREFIELD**
**TESTIMONY OF ROBERT REFFITT**
BEFORE THE HONORABLE ALGENON L. MARBLEY
UNITED STATES DISTRICT JUDGE, and a jury
DECEMBER 17, 2021; 9:00 A.M.
COLUMBUS, OHIO


APPEARANCES:

FOR THE PLAINTIFF:
        Friedman, Gilbert & Gerhardstein, LLC
        By:  Sarah J. Gelsomino, Esq.
             Marcus Sidoti, Esq.
        50 Public Square, Suite 1900
        Cleveland, Ohio  44113

        Friedman, Gilbert & Gerhardstein, LLC
        By:  Rebecca P. Salley, Esq.
        441 Vine Street, Suite 3400
        Cincinnati, Ohio  45202

        Law Office of Lori Brown Johnson
        By:  Lori A. Brown Johnson, Esq.
        681 South Front Street
        Columbus, Ohio  43206

APPEARANCES CONTINUED:

FOR THE DEFENDANTS:
      Columbus City Attorney's Office
      By:  Andria C. Noble, Esq.
           Alexandra N. Pickerill, Esq.
           Sheena D. Rosenberg, Esq.
      77 North Front Street
      Columbus, Ohio  43215

- - -

      Proceedings recorded by mechanical stenography,
transcript produced by computer.

3

1                             FRIDAY MORNING SESSION

2                             DECEMBER 17, 2021

3                                 - - -

4                            * * * * *

5                                 - - -

6                      LEVON MOREFIELD

7   Called as a witness on behalf of the Defendant, being first

8   duly sworn, testified as follows:

9                   DIRECT EXAMINATION

10  BY MS. NOBLE:

11  Q.   Sergeant Morefield, can you tell me what you do for a

12  living?

13  A.   Yes.  I'm a Columbus police sergeant with the Columbus

14  Division of Police in Columbus, Ohio, here.

15  Q.   I'm going to ask you to tell me a little bit about your

16  life, but I want to start off with your early life.

17  A.   As far as like?

18  Q.   When you were a kid.

19  A.   Much like Officer Johnson, I'm also a native of

20  Columbus.  I grew up in the Linden area.  Really unique.  I'm

21  going to try to make it as quick as possible because I could go

22  on.  I could have us here till Christmas.

23       I grew up on the other side of law enforcement.  I was

24  actually born to parents who were addicts of crack cocaine.  I

25  was actually born addicted to crack cocaine, and I was the

4

1    youngest of three brothers.  My parents to this day are still

2    crack addicts.  My mom, unfortunately, still struggles with

3    addiction.  She lives on the 2nd Precinct which is the Linden

4    area, the same precinct I grew up on.

5         Growing up, my parents were kind of in and out of the

6    picture.  We went from home to home, foster care, a bunch of

7    different things.  It wasn't really foster care.  It was just

8    whoever could help us out at the time and could feed us.

9         As a result, as I got a little older -- little older

10   being nine years old -- at the age of nine, I started selling

11   crack cocaine myself.  It was what my two older brothers and

12   what my cousins did.  And my aunt who was taking care of me at

13   the time literally told me, hey, you got to figure it out.  And

14   by figure it out, she went -- and I had to take on the family

15   business which was start peddling drugs.  She said she wasn't

16   going to feed me.  She couldn't afford to feed me.  If I wanted

17   to eat, I pretty much had to start running drug for my brothers

18   and cousins.

19        At nine years old in the third grade, that was the first

20   time I was arrested for possession of crack cocaine.  It wasn't

21   two years later I found myself with a second felony arrest as a

22   juvenile.  I got caught with the firearm while driving to go

23   deliver more drugs.

24        With that, I know Judge Marbley said not to get into too

25   much narrative.  I'm not sure if that's what you're looking

5

1  for.  That's how my life started.  That's the basics.  I know

2  she asked about the childhood.  I think just kind of want to

3  paint a picture of the childhood.  But I can keep going on

4  unless she has another question for me.

5       THE COURT:  Sergeant Morefield, that comment was not

6  directed to the witness.  It was for the lawyer to break up

7  your answer so that the jury could be able to follow it.  So

8  now you're talking about your childhood.  She may ask you

9  questions about what you were doing as an adolescent, et

10  cetera.  I don't want you to curtail your answers.  Answer your

11  questions thoroughly.

12       THE WITNESS:  My apologies.

13       THE COURT:  No problem.  Go ahead, Ms. Noble.

14  BY MS. NOBLE:

15  Q.   You kind of stopped at age 11.  What happened after that

16  until you were like probably 18?

17  A.   So, actually, during the second arrest -- again, much

18  like Officer Johnson growing up in inner city Columbus, you're

19  kind of lied to.  You're lied to by the media.  You're lied by

20  your -- my role models at the time were family members who have

21  all been in and out of prison, all felons, people that I grew

22  up with in the neighborhood.  And you're lied to by the

23  community that you can't trust the police and that the police

24  is almost the enemy.  And especially like I'm considered a

25  black American.  My father is black.  My mother is white.  But

6

1   in the black community growing up, it was never okay to trust

2   the police, at least in the Linden area that I grew up in, and

3   especially white police officers.

4          And the second officer that arrested me happened to be a

5   white police officer.  And it was that interaction that started

6   to get me on the right track just because in the back of --

7   when I was in the back of his cruiser, some of the things that

8   he was saying to me -- and he was asking questions, and the way

9   he treated me.  It changed my perception at 11 years old

10  because I kind of knew then what I've been told isn't the

11  truth.  Here this officer is, he just caught me with a gun that

12  I could have used to harm him, and he's asking questions like

13  where is your mom at?  Who takes care of you?  How do you eat?

14  How do you get to school?  Are you going to school?

15         He told me there's life outside of Linden.  You got to

16  figure out a way to get out of this neighborhood.  He actually

17  said, You're not actually a bad kid, you're just in a bad

18  environment, and started using phrases like you're going to

19  become a product of your environment.

20         That's truly what happened.  And it happened with both

21  of my brothers who are now today both serving life in prison.

22         With that, he asked, What are you good at?  I was just

23  like, you know, I'm good at football.  He says, You can't play

24  football in jail.

25         So as soon as I got out -- I was released from juvenile.

1    It was -- it wasn't automatically.  It wasn't straight and

2    narrow.  I had to start surrounding myself with positive people

3    in order for positive things to happen.  I knew the life I was

4    living I was going to end up dead or in prison, which happened

5    to my older cousins and both of my brothers.  Luckily they

6    survived several incidents and they're not dead, but they are

7    serving life in prison.

8         With that, I had a lot of help from teachers and coaches

9    who knew I wanted to do well.  I had to stay very disciplined.

10   It was tough.  I started realizing that everything you do in

11   life is a -- is like everything in life has consequences.

12   Everything is based off of your actions, and for every action

13   there is a reaction.

14        As I started to make different decisions and start to

15   live a different way, I started to get a different outcome.

16   People who were willing to help me but weren't afraid to no

17   longer help me because of the lifestyle I was living, that help

18   became more available.  I had different teachers help me out,

19   different friends, families, who knew this kid wants to change

20   but he's just in an unfortunate environment.

21        I ended up in high school.  It was rough at first.  My

22   first two years I didn't have a GPA at all because I was still

23   kind of running the streets; just thankfully never got caught

24   because it would have been my third felony arrest as a

25   juvenile.  I knew I needed to get on the football field.  I was

8

1　going to use football as a ticket to make it out of the hood.

2　Sounds cliché, but that's exactly what happened.

3　　　　I ended up playing my junior year at Brookhaven High

4　School which is in the North Linden area.  The first year I

5　played, we ended up winning the state championship.  We were

6　the first city league school to ever do it in our state and any

7　of the surrounding states.  And we're still the only city

8　league school to ever do it in our state and any other

9　surrounding states.

10　　　　And then my senior year I only got to play in the first

11　game because I broke my foot.  It was a season-ending injury.

12　So I only played my junior season and the one game my senior

13　season, but it was enough to get me to the University of Akron

14　where I ended up playing college football at.  Prior to that, I

15　was the first one in my family to ever graduate high school,

16　let alone go to college and graduate with honors.

17　　　　And just to kind of paint the picture, nobody goes to

18　college to play Division 1 college football without NFL dreams.

19　That was always a dream of mine, especially this is going to be

20　such an amazing story to come from where I came from to make it

21　to the NFL.  I found out the first day of summer camp I'm not

22　going to NFL.  These guys are really good.  This is Akron.

23　This isn't Ohio State or Alabama.

24　　　　With that, as time went on, I actually studied biology,

25　pre-medicine, double major business administration and a minor

9

1    in criminal justice.  When I was a sophomore in college, again,

2    NFL dream was on the back burner.  But I started trying to

3    figure out what I wanted to do.  I was pre-medicine, but I knew

4    I didn't want to actually study or practice medicine.  I just

5    did it because I thought it was a good thing to do.  It was

6    kind of a waste to have a degree in something I'm not using.

7          With that, I had a professor in one of my criminal

8    justice classes -- it was principles of criminal law -- who was

9    an officer in Stowe, Ohio.  And I just asked like would it be

10   possible to take a ride-along with you.  And he was like,

11   absolutely, I'll bring you on a ride-along; and kind of just

12   explained my background to him.  He was blown away.  How does a

13   kid like you make it to where you're at?

14         I told him the interaction I had with that officer when

15   I was 11.  It impacted me to this day.  And with that, it would

16   be awesome if I would ever have the opportunity to go into law

17   enforcement.  And he is the one who brought it to my attention

18   that, hey, those criminal acts are as a juvenile.  You can get

19   your record expunged and there's nothing that's going to keep

20   you from becoming a law enforcement officer.  And that set that

21   fire underneath me.  I knew what I wanted to do was give other

22   youth the same opportunity that officer gave me.

23         And since -- I know this isn't what she asked, but since

24   being an officer, I found out that I don't only get an

25   opportunity to give youth that same treatment and opportunity

1   and help them out, but also adults.  Because, unfortunately,

2   people don't know what they don't know.  I'm a living example

3   of that.  As a result, it was a passion of mine to pursue not

4   being a police officer anywhere but being a police officer here

5   in Columbus, Ohio, where I was born and raised because there's

6   other youth out there and other people out there who grew up

7   just like I did, who don't know they can make it out of the

8   environment and the situation they're in.

9           That's -- I rambled.  I'm sorry.

10  Q.   I understand.  So you did the ride-along and that kind

11  of helped solidify that you wanted to be a police officer?

12  A.    It did.  It was a much different department, but the

13  ride-along was more of an eight-hour mentor session and just

14  kind of learned about him and he learned more about me.  And he

15  is a gentleman that I still keep in touch with.  But he

16  actually retired.  And he's a full-time professor.  But that

17  was just the start; Stowe, Ohio, a much smaller town.  It was a

18  start.

19          Even as a kid growing up in the inner city, I was still

20  intrigued by the lights and sirens and things like that.  The

21  ride-along was more of a mentor session.  It was actually an

22  uneventful night, but that was the start of me chasing and

23  pursuing a career in law enforcement.

24  Q.   What steps did you take -- actually, first, what

25  position did you play in football?

11

1    A.    So I was what my coach called a utility infielder which

2    is not a real position.  But I started off playing safety, but

3    I moved around a lot.  I didn't have a dedicated position in

4    college.  I was undersized to play Division 1 college football.

5    So I started off playing safety, played running back.  And then

6    I ended my senior year, I was a fullback.

7    Q.    What steps did you take after that ride-along that

8    helped you become a police officer with the Columbus Police

9    Department?

10   A.    Following the ride-along, I still was in football.  And

11   I ended up earning scholarships.  So they were paying for my

12   school.  So I had a commitment to football and the team.  As

13   far as being an undersized player, I ended up winning a

14   national award, the Rudy award.  I'm not sure if anybody has

15   seen the movie Rudy, but I actually got to meet the real Rudy.

16   And that award was given to the most inspirational Division 1

17   college football player that exemplifies courage, commitment.

18   It's going to sound bad, but I don't remember the other two

19   characteristics.

20         With that, won that national award, kind of professed my

21   passion for being in law enforcement and got a lot of offers

22   from law enforcement agencies all over the country.  And I

23   respectfully turned them down and explained to them I just

24   don't want to be in any law enforcement.  I want to be in law

25   enforcement with the Columbus Division of Police.

12

1      So I started reaching out to people that were local and

2  figuring out -- and I was introduced to the recruiting unit who

3  explained to me what steps I had to do to apply and what it

4  would take to get on.  And just because of my background, we

5  actually sat down and went through all of the background

6  removal standards to make sure there was nothing in my

7  background that would be cause for removal from their process.

8  And I -- November of 2010, which was one year before I

9  graduated college, I ended up applying to the Columbus Division

10 of Police.

11 Q.   And when did you start the academy at the Columbus

12 Police Department?

13 A.   I did not start the academy until December of 2014.

14 Q.   What did you do -- I know you said you applied a year

15 before you graduated.  What did you do after you graduated from

16 college and before starting with the Columbus Police

17 Department?

18 A.   I was under the assumption that being a police officer

19 was like any other profession or job.  You apply and then a

20 month later you're working.  And I was clearly wrong.  It's a

21 really, really rigorous process.

22      After graduating, I took the MCAT which is the entrance

23 exam into medical school, scored pretty well on it.  Once I

24 found out how long the process of being an officer was, I got a

25 couple of options.  I can pursue medical school, which I chose

13

1    not to, or I could do something to get me by until I become an

2    officer.  I thought, at max, it would take nine months to a

3    year.  You see it took over four years.  And I'll get to that

4    reason in just a minute.

5         I ended up getting into sales.  I was a retail sales

6    consultant with AT&T.  And I thought it was just going to be

7    like a -- just an entry-level job right out of college until I

8    became a police officer.  I ended up not getting accepted.  I

9    never got denied or rejected, but I didn't get accepted and it

10   was because of my background.  And with that -- at that point,

11   I had to figure out a new -- AT&T is not going to be my career.

12   I want to pursue being a police officer, but it seems I'm going

13   to have to fight and jump through a bunch of hoops in order to

14   get admitted into their academy.

15        So I ended up leaving AT&T.  I got into the mortgage

16   industry for a little while which is originating loans,

17   refinances.  When people purchase homes, I was the lender, and

18   ended up doing really, really well for myself in a short amount

19   of time there.  And just kind of got tired of sales, always

20   having quotas and things of that nature.  All this time I'm

21   still fighting to get on the police department.  And I ended up

22   leaving the mortgage industry in June of 2013 and went into the

23   business for myself.

24        I ended up -- I always liked to do things with my hands.

25   While in college, some of the side jobs I did was contracting

1    work.  So any kind of remodeling, home construction, things

2    along those lines.  That is what I did for summer jobs.  And I

3    always like to see the fruit of my labor.  So it was always

4    something fun, putting puzzles together, things like that.  It

5    was like puzzles for adults is what I looked at contracting as.

6        I thought it would be neat to go into business for

7    myself.  I ended up acquiring a bunch of rental properties in

8    the Old Brooklyn area, owned 51 units in Old Brooklyn, and

9    started my own property management company, my own contracting,

10   restoration company.  I'm a preferred vendor with All State and

11   the entire northeast region of Ohio.

12       And I started giving up on becoming a Columbus police

13   officer because it seemed like I was just in limbo, couldn't

14   get a solid answer.  I started planting my seed, per se.  My

15   wife and I thought, hey, we'll just settle here.  She was

16   working as a nurse at the Cleveland Clinic, had a great job

17   there.

18       It was November of 2013.  So five months after I went

19   into business for myself and started doing really well, I got a

20   call from a background investigator with the Columbus Division

21   of Police who said that Mayor Coleman had instructed at the

22   time Safety Director Mitchell Brown to go back through my

23   packet and put me back in the process.

24       And he called and asked was I interested.  And I was

25   like you bet your A-S-S I'm interested.  This was what I want

15

1    to do for a living.  While I won't make as much money, I won't

2    have as nice of a life, it's in my opinion what I was called to

3    do and it's going to be more gratifying even if I can reach one

4    life the way that officer reached me.

5         So I was back in the process and still had to fight a

6    little bit when I was in the process because I met a lot of

7    opposition, again, because of my background.  Although it

8    wasn't grounds for removal, it's not common for a felon to

9    become a police officer.  And thankfully it was as a juvenile,

10   not as an adult, because it would have permanently disqualified

11   me.  I eventually made it through and started the academy

12   December 8th of 2014.

13   Q.   And you heard Officer Johnson talk about how long the

14   academy is.  It was six months, is that correct, for you as

15   well?

16   A.   It's a -- it was a little longer for me.  Out of all of

17   everybody that's over there, all the officers over there, I'm

18   the newest.  I went through the academy the most recent.  And

19   my academy was 32 weeks which is a little longer than six

20   months.  They are continually adding and I guess just

21   constantly improving.  But the training becomes more and more

22   rigorous.  And even now today, it's even longer than that.  But

23   it was a little longer than six months, to answer your

24   question.

25   Q.   And what is your current assignment?

16

1    A.    I am a relief sergeant on Zone 5C Company covering 11

2    and 12 Precincts.

3    Q.    What does that mean?

4    A.    So I am -- I am not actually in charge of a unit.  So,

5    for instance -- a unit meaning a precinct.  So in Zone 5 -- as

6    we mentioned before, the city is composed of five zones, 20

7    precincts.  Zone 5 consists of 11 Precinct, 12 Precinct, 7

8    Precinct and 16 Precinct.  Each precinct, each shift -- so

9    three different shifts, they have a sergeant.

10          So, for example, S12 would be Sergeant 12 but S12C is

11   the 12th Precinct sergeant on third shift.  S12B is 2nd

12   Precinct sergeant on second shift.  S12A would be the 12th

13   Precinct sergeant on first shift.

14          So A, B and C Companies are A for first, B for second, C

15   for third shifts.  With that, B sergeants work five days a

16   week.  They are assigned to five, eight-hour shifts.  On their

17   days off, there's another sergeant who is considered a relief

18   sergeant who fills in on their days off.  So, for instance, the

19   11 Precinct, third shift sergeant, his days off are Saturday

20   and Sunday.  So when he's off Saturday and Sunday, I fill in as

21   S11 on Saturday and Sunday nights.  The 12 Precinct sergeant,

22   his days off are Thursday, Friday.  So I fill in Thursday and

23   Friday nights as S12.

24          I am unassigned on Monday meaning that I could be sent

25   anywhere in the city that needs coverage or anywhere on the

17

1    zone which -- because people take vacation.  So even though

2    they have scheduled days off, they may be sick, they may be in

3    training.  So other times I'll cover -- for instance, this week

4    the normal S11C, he is on vacation.  So I've been working S11C

5    all this week.  So I cover -- I'm mainly responsible for

6    covering those two precincts when their respective sergeants

7    are off.

8    Q.    I know you indicated that your academy was a little

9    longer than what Officer Johnson described.  Would you say that

10   his description of what is covered in the Columbus police

11   academy was similar to what you went through in the academy?

12   A.    I'd say for sure.  Of course, with our academy being a

13   little longer, some training was added.  And the training that

14   was added in my academy and academies that follow my academy,

15   that's training that the entire division is caught up on during

16   in-service and things of those nature when we come back for

17   annual or semiannual training.

18   Q.    Officer Johnson talked about the use of force or the

19   defensive tactics training.  How often did you complete that

20   training?

21   A.    So we complete the training annually.  I happen to be a

22   defensive tactics instructor.  I was a defensive tactics

23   officer, and now that I'm a sergeant, I'm a defensive tactics

24   sergeant.  So I actually do the training quite frequently.  I'm

25   there at least two to three days out of every month.  But in

18

1  certain circumstances, like what's coming up, following the

2  week of Christmas I'll be out there for a two-week period to

3  help out and assist as needed with the current recruits in the

4  academy.  And people who were on military leave, who were on

5  baby leave or injury leave, they need to get caught up in their

6  required training.  And I will be out instructing people from

7  the division getting them caught up on their in-service

8  training.  I complete the training more frequently.  I have to

9  as an instructor.  But we at least complete the training

10  annually.

11  Q.  Since becoming a sworn officer with the Columbus Police

12  Department, have you had any -- aside from being a patrol

13  officer and a sergeant, have you had any special assignments or

14  temporary assignments?

15  A.  I have.  I wear a lot of hats for the division.  You

16  want me to go through them?

17  Q.  If you could briefly state which ones you were a part

18  of.

19  A.  I'm part of our Honor Guard.  I'm part of our peer

20  assistance team, defensive tactics instructor.  I was a field

21  training officer.  I actually promoted out of that.  You can't

22  be a sergeant and field train recruits anymore.  So I promoted

23  out of being an FTO, as we call them.

24      I'm part of Teams and Police Service which is TAPS.

25  It's a program where we go into high schools and middle schools

1  and create a working relationship with youth that have been

2  identified as troubled youth by their principals, by their

3  teachers, things of that nature.  I am a part of our bicycle

4  unit, our bike rack and response team.  Those are just some of

5  the things that I can think of.

6        I also was administratively transferred to robbery for a

7  period of eight months where I was lead detective on 25 cases

8  between commercial and individual robberies.  And I actually

9  have done some temporary assignments with the gang unit.  I've

10  done a temporary assignment with the Violent Criminal Working

11  Group.  And then I've done temporary assignments where I was a

12  full-time defensive tactics instructor instructing the recruits

13  and doing our in-service training for the entire division,

14  which I've literally trained everyone on the entire division in

15  some form of defensive tactics whether it's handcuffing or

16  boxing or grappling.  That includes the chiefs of police, the

17  deputy chiefs.  That includes everyone on our entire division I

18  have trained as a defensive tactics instructor.

19  Q.   You indicated the Violent Crime Working Group which is

20  the temporary assignment you were on on September 1st, 2017; is

21  that correct?

22  A.   Yes, ma'am, that's correct.

23  Q.   You heard Officer Johnson describe the Violent Crime

24  Working Group.  Would you say that his description was an

25  accurate description of the Violent Crime Working Group?

20

1    A.   Yes.

2    Q.   Prior to September 1st, 2017, had you ever had any

3  interaction with Mr. Davis?

4    A.   I had not.

5    Q.   What did you know about Mr. Davis prior to your

6  interaction?

7    A.   So prior to September 1st I knew that Mr. Davis had

8  warrants for assaulting a police officer in Columbus, Ohio, and

9  another warrant out of Kentucky for causing serious physical

10  harm to either a police officer or state trooper in Kentucky.

11    Q.   Do you remember when you first heard about Mr. Davis?

12    A.   I do.

13    Q.   How far in advance to September 1st was it?

14    A.   I can't recall exactly.

15    Q.   Do you know if it was days, weeks, months?

16    A.   I'd say at minimum a week to week and a half.

17    Q.   How did you learn about Mr. Davis's warrants?

18    A.   So just to paint the picture of how we learn about

19  warrants in general, we actually find out through word of mouth

20  a lot of times, and then we have a verification system to

21  verify.  But I actually learned about Mr. Davis's warrants I

22  want to say two ways.  The first way was through Officer Baker

23  who had shared his knowledge or some of his knowledge regarding

24  Mr. Davis's warrants.

25        And then the second was -- every day, Monday through

21

1    Friday, we have something on the Division of Police called a

2    daily bulletin that is sent out every single day.  And that

3    daily bulletin has like, you know, if you got to get your

4    in-service training made up.  Like today's daily bulletin

5    posted something about uniforms.  It's like an update to

6    uniforms.  We're going to be switching our hats from the

7    eight-point cap you see me wearing in here everyday to ball

8    caps.  That's at the chief's discretion.

9         All the way at the bottom of each daily bulletin, it

10   always runs a list of wanted people.  It has their name and

11   warrants and also has a list of cancellations.  So if that

12   person was arrested, it will say like canceled and their name

13   and everything that is associated with it will be stricken, or

14   have a line actually going through the middle of it showing

15   it's canceled because they have been apprehended.  And I want

16   to say that was the second way I saw Mr. Davis's name in the

17   daily bulletin as well.

18   Q.   So on September 1st you ended up at Livingston Market in

19   the evening.  Can you tell me once you drove up to Livingston

20   Market what you did?

21   A.   Once we drove up to Livingston Market, I put the car in

22   park.  And I'm pretty sure I took the keys out because it was a

23   plain car, not a cruiser.  Usually we leave the cruiser running

24   because it's a police cruiser and, you know, the concern really

25   isn't with it being stolen.  Since this was a plain car, I

22

1    think I took the keys out, or at least turned the car off --

2    put it in park and turned the car off.  I exit the vehicle and

3    I draw my firearm and I start heading into the market.

4        Q.    What were you wearing that day?

5        A.    I was wearing a Columbus police -- a division-issued

6    tactical vest.  I was wearing khaki pants.  I had a drop leg

7    tactical holster.  I had a red Coca-Cola, Dr. Pepper shirt on,

8    and tennis shoes.

9        Q.    The tactical vest that you were talking about, was that

10   similar or the same one that we were showing during opening

11   statements?

12       A.    The vest that I had on was the exact same vest with the

13   exact same setup that was shown here on opening statement.

14   That was the vest I wore that day in the same condition.

15       Q.    Why did you have your firearm out?

16       A.    So part of our policy when arresting felons is to -- we

17   have something called a felony stop.  So, if we were to pull a

18   felon, a wanted felon, over in a vehicle, we arrest them at

19   gunpoint due to the potential for violence.  So to have the gun

20   out, it's part policy.  However, that day as we were

21   approaching the store, I observed Mr. Davis standing outside of

22   the store.  And it appeared that Mr. Davis peered into our

23   vehicle a little bit.  And, to me, it appeared that Mr. Davis

24   understood what was about to take place.  It looked like

25   Mr. Davis saw us and knew that we were police with how fast I

23

1   pulled up in that vehicle and pretty much did a jump-out. How

2   fast I approached in that nature, I was under the impression

3   that Mr. Davis knew that we were the police.

4         And what I would describe is what Mr. Davis's actions is

5   he dipped back into the store which is a quick, furtive

6   movement to get back into the store. As a result of that, just

7   in my experience and training, it's usually when someone is

8   either getting ready to draw a weapon or toss a weapon or

9   draw -- or to draw to hide contraband. As a result of the

10  unknown and Mr. Davis's quick motions to get back into the

11  store, I drew my weapon in the event he was also drawing a

12  weapon or had a weapon.

13        THE COURT: Officer -- Sergeant, I want to clarify one

14  thing. You said it's a part of the department policy whenever

15  you're executing an arrest under a felony warrant you are to

16  draw your weapon. Is that what you just said?

17        THE WITNESS: No, sir, a felony stop. I apologize. A

18  felony stop, if we were to perform a felony stop, a felony

19  traffic stop. If I were in my cruiser and I run a person's

20  information through LEADS – that's the system where we verify

21  warrants and people's information – and it kicks back that this

22  person has a valid warrant, if I'm a single officer in a patrol

23  car, I am supposed to wait for one other officer. Our division

24  policy requires that two officers, no minimum than two, make an

25  arrest on a wanted felon.

24

1    With that, the way that we make a felony stop is at

2    gunpoint.  We don't want to approach the felon.  We want the

3    felon to come back to us in a felony traffic stop.  And part of

4    that policy is to have that felon at gunpoint at all times and

5    you have a contact and a cover.  And taking part of that

6    policy, Your Honor, since I wasn't the first one in the store,

7    I was going to be the cover officer, which means I was covering

8    Officer Johnson who was the first officer which is also the

9    contact officer, the first officer to make contact while I'm

10   holding Mr. Davis at gunpoint.

11       Does that clarify, sir?

12       THE COURT:  No.  Because what I don't understand is is

13   it limited to traffic stops?

14       THE WITNESS:  No, sir.  I was using the felony stop

15   policy.

16       THE COURT:  That's where I'm unclear.  If you're

17   executing an arrest warrant for someone who has a felony

18   warrant, then when you approach that person, you are to have

19   guns drawn.  That was my original question.  And then I thought

20   you said, well, it's just for traffic stops.  And then I

21   thought you said, no, it's not limited to traffic stops.

22       THE WITNESS:  It's not limited to traffic stops.  It's

23   also not policy to always have a gun drawn.  But when we are

24   approaching a felon, we are to have our gun drawn during a

25   traffic stop.

1      THE COURT:  So it's just during a traffic stop when

2  you're approaching a felon to arrest pursuant to a felony

3  warrant that you are to draw your gun?

4      THE WITNESS:  That is the policy statement, that we

5  shall; not should, but shall.

6      THE COURT:  I understand.  Please continue.

7  BY MS. NOBLE:

8  Q.   You were talking about contact/cover.  Officer Johnson

9  was the contact officer, meaning he was the person that was

10  approaching Mr. Davis, and you were the cover officer.  What

11  does the cover officer do?

12  A.   So my job as a cover officer is to make sure, with my

13  gun trained on Mr. Davis, that he does not reach for a weapon,

14  he does not draw a weapon, he does not do anything that is

15  going to cause serious physical harm to Officer Johnson, the

16  contact officer, or to anyone else.

17  Q.   What did you observe when you were -- when Officer

18  Johnson and you were approaching Mr. Davis?

19  A.   So when you go through the door, the -- I'm not sure if

20  this was explained, but this is the way I remember it.  The

21  right door going in, which is the left door going out, it was

22  actually propped open from what I recall.  It was propped open.

23  So when we entered the store, I was behind Officer Johnson.

24  And I observe Officer Johnson I want to say looking straight or

25  looking to the left.  So as I'm coming in, I'm looking to the

26

1   right because that's the way we're trained.  If one officer is

2   looking one way when you're entering a building, the other

3   officer is going to look the other way.  There's no need for

4   us, if we're entering a building, for us to both be looking the

5   same way and then a potential danger is behind us.

6          So, as a result, I observed Officer Johnson looking

7   straight or to the left.  So as I was going in, I was trying to

8   look to the right to see if Mr. Davis potentially went that

9   way.  As I didn't see him, I heard Officer Johnson announce

10  Columbus police, Timothy Davis, you're under arrest for your

11  warrants, man, something along those lines.

12  Q.   Did you hear Mr. Davis respond?

13  A.   I did.

14  Q.   What did Mr. Davis respond?

15  A.   He said, as he's looking back at Officer Johnson, no,

16  I'm not.

17  Q.   You said as he was looking back.  Was he facing Officer

18  Johnson or looking away?

19  A.   Not looking -- he was facing away from Officer Johnson

20  with his left body towards -- or the left side of his body

21  towards Officer Johnson.  From what I recall, he was walking

22  towards the exit of the store.  He's looking at Officer Johnson

23  like as he's walking away saying, no, I'm not.

24  Q.   Had you and Officer Johnson left that initial threshold

25  of the doorway?

27

1    A.    No, ma'am, we had not.

2    Q.    What happened after Mr. Davis stated, no, I'm not?

3    A.    Officer Johnson was approaching him, and Officer Johnson

4    went to grab ahold of him in attempt to put him in the

5    handcuffs, literally textbook the way we're trained to approach

6    subjects as we're going to take control of them and put them

7    into handcuffs.

8    Q.    I'm going to backtrack just a little bit.  Before, when

9    Mr. Davis said, no, I'm not, what did you think that meant?

10   A.    I thought it meant, no, I'm not under arrest.

11   Q.    At that point did you believe he understood that you

12   were Columbus police?

13   A.    I think he absolutely knew that.  I think Mr. Davis,

14   without a doubt in my mind, knew that we were Columbus police

15   officers.

16   Q.    You indicated that Officer Johnson grabbed Mr. Davis to

17   put him in handcuffs.  Can you describe in more detail, if you

18   saw it, what Officer Johnson did?

19   A.    So what I saw Officer Johnson attempt to do was

20   something that we call a double C-Clamp.  And what that is --

21   I'm going to make the motion with my hands.  My right hand, if

22   I'm approaching the subject on the left side of the body, is

23   going to be a little higher, and my left hand is going to be a

24   little lower.  With my right hand, I have them in Cs like

25   C-Clamps, it is going to be placed right above the subject's

28

1  elbow, and my left hand is going to be placed on the subject's

2  wrist.  We call that opposing C-Clamps.

3      The reason we train to grab people that way is because

4  if we can get ahold of them, we have a better chance of

5  controlling their body, controlling their arms; and actually

6  taking the hand that's on the wrist, which in this event would

7  be my left hand, keeping their arm with my right hand posted

8  here, that way they can't move it, and then forcing that hand

9  behind their body, or just placing that hand behind their body

10  if they allow us, into the handcuffing position.

11  Q.   After Officer Johnson attempted to get Mr. Davis's hands

12  behind his back, what did you observe?

13  A.   As soon as Officer Johnson touched Mr. Davis, I saw a

14  violent reaction from Mr. Davis.  And prior to getting into

15  that, the thing I know from training in the academy is that

16  67 percent of all resistance happens upon first touch.  They

17  literally drill that into our heads.

18      Even backing up a little further, we are also trained

19  that the first sign that someone will use violence against you

20  is when they do not comply with your commands.  The initial

21  noncompliance was, no, I am not.  That's what I observed.  It

22  was an indicator that Mr. Davis is probably going to do what I

23  knew him to do in the past based off -- or allegedly what I

24  knew him to allegedly do in the past based off the warrants is

25  probably resist and flee.  That's where my mind started going.

29

1       As he was making this violent motion towards Officer

2  Johnson, once Officer Johnson tried to grab him, I saw that

3  Timothy Davis did not have a weapon in his hands.  It looked

4  like he had a cell phone in his hands.  I immediately

5  re-holstered my weapon.  And as I was re-holstering my weapon,

6  the commotion is going on.  I started approaching as well to

7  try to assist Officer Johnson in taking control of Mr. Davis.

8    Q.    Did you observe what Mr. Davis did to Officer Johnson at

9  that time?

10    A.    So what I observed is when he tried to grab Mr. Davis,

11  the violent motion I remember is him turning into Officer

12  Johnson and then moving Officer Johnson.  Whether he was

13  pushing him, trying to tackle him, I don't know, but he was

14  moving Officer Johnson.

15    Q.    How did you respond to Mr. Davis's violent resistance in

16  moving Officer Johnson?

17    A.    So with how violent that initial motion was and how

18  quick everything was heading, and I knew again with the

19  experience -- or not the experience but the prior knowledge of

20  Mr. Davis allegedly fleeing in the past and also resisting in

21  the past, that caused me to immediately go to a level four and

22  I struck Mr. Davis in the face, struck him in the face again,

23  and then struck Mr. Davis in his I want to say left lower rib

24  area.

25    Q.    You indicated that you struck him in the face?

30

1    A.    Yes.

2    Q.    Which side of the face, do you recall?

3    A.    So I struck Mr. Davis in the left side of his face in

4    the lower jaw, cheek area with my right fist twice.

5    Q.    And then the lower rib area, was that also with your

6    right hand?

7    A.    I want to say -- and I may be out of order when I

8    actually struck him, but in the lower rib area.  That may be

9    out of order, but, yes, it was with my right hand as well.

10   Q.    After you struck him in the face, do you recall what

11   happened next?

12   A.    Yes.  So the entire purpose for striking him in the face

13   is a distraction, to try to discombobulate him temporarily so

14   we can take control of him.  I struck him in the face the first

15   time, and it was -- there was no effect.  He was looking right

16   at me as I did it.  He didn't stop.  He didn't stop.  It was

17   like I struck him, he looked at me.  He did not stop wrestling,

18   as I would call it, with Officer Johnson.  So I struck him

19   again, which I would call both times being ineffective because

20   he looked at me again.

21        After I struck him again, I think in an attempt to being

22   struck a third time, Mr. Davis started bending over and not

23   necessarily in a tackle position, but was bending over coming

24   forward with his arms forward as he's trying to push through as

25   if you're trying to push through a crowd.  And the area he was

31

1    trying to push through or to get to appeared to be the exit.

2    In it attempt to stop him from doing that, I grabbed Mr. Davis.

3    And at this point his head is right in my belly, because I was

4    trying to grab him just to be able to gain control of him.

5         As he went down and his head in my belly, I just

6    transitioned to a knee strike. As his head is in my belly, I

7    grabbed the back of his head, kind of the base of his neck, and

8    I transition -- I deliver a knee strike to his sternum area

9    again in an attempt to distract, to knock the wind out of him

10   in an attempt to gain control of Mr. Davis.

11   Q.   Do you know if any of the other officers besides Officer

12   Johnson was in the market by the time you did your two closed

13   fist strikes to his face?

14   A.   I would assume that they came in as quick and with as

15   much urgency as I did. However, at this point in time, this

16   like -- the struggle had already started, and it started just

17   happening very fast, very fluid. So I do not recall seeing

18   anyone except Officer Johnson and then Mr. Davis. And I felt

19   like I heard feet shuffling behind me, which I would assume

20   would be Officer Connair, Officer Everhart.

21   Q.   When you did the knee strike to his sternum, to

22   Mr. Davis's sternum, do you know if any of the other officers

23   were present yet?

24   A.   Again, Officer Johnson and -- Officer Johnson was the

25   only officer that I could visually see. I was not able to see

32

1    Officer Connair, or do not recall seeing Officer Connair or

2    Officer Everhart yet.  It was really quick.  There was not much

3    time between -- this all happened in the snap of a finger it

4    seemed like, as far as these strikes, how quick it started and

5    where we were at at this point.  And I did not recall by the

6    third strike being the knee strike, I did not recall seeing

7    Officer Everhart or Officer Connair at this point.

8       Q.   After the knee strike to his sternum, to Mr. Davis's

9    sternum, what happened after that?

10      A.   So, after the knee strike to Mr. Davis's sternum, I

11   recall the -- I'll just, for lack of a better term, the

12   commotion, the struggle, the entanglement going away from the

13   door, as that was our goal to keep Mr. Davis from leaving the

14   store.  The ultimate goal was get him in handcuffs.  It was

15   going away from the door.  At that point I saw Mr. Davis trying

16   to get away from Officer Johnson, and that's when I delivered

17   the punch to Mr. Davis's lower left rib area with my right

18   hand.

19      Q.   Do you know if any of the uses of force that we've

20   discussed so far, the two closed fist strikes to the face, the

21   knee strike to the sternum, and the closed strike to the ribs,

22   are they on any of the videos we've seen?

23      A.   They are not on the videos we've seen.

24      Q.   What happened after you struck Mr. Davis in the ribs?

25      A.   Mr. Davis eventually went to the ground.  He was pulled

1    to the ground I want to say by Officer Johnson possibly.  Once

2    Mr. Davis was on the ground, he was on his back, and he had

3    what I call posted up, "post" meaning using one of his limbs to

4    post his body almost like a beam.

5        As he posted -- he was posting with his left hand in an

6    attempt -- it appeared he was getting back up.  As soon as he

7    hit the ground, he was getting back up really quick, which our

8    goal is keep them on the ground, keep any person we are

9    wrestling or struggling with on the ground.  As he was trying

10   to get back up, I delivered a kick to his brachial plexus

11   tie-in which is the area directly under the armpit, a bundle of

12   nerves.  I know that area was mischaracterized by the

13   plaintiff's opinion witness.  He was actually describing

14   something called the suprascapular and the clavicle.  I'm not a

15   doctor.  However, in our training, we are trained with

16   anatomical pictures of where these bundle of nerves are, where

17   to strike, how to strike, things along those nature.

18       And the security chief described the brachial plexus

19   tie-in wrong to the jury and the courtroom.  The brachial

20   plexus tie-in is underneath the armpit.  I delivered the kick

21   with my right foot, and it actually landed.  And in delivering

22   that kick, my shin, not my foot, went across Mr. Davis's face

23   because, as he's trying to get up, I delivered the kick with my

24   foot successfully striking the brachial plexus tie-in, and my

25   shin inadvertently went across Mr. Davis's forehead area.  And

34

1    that was what Mr. Sidoti earlier referred to as a kick to

2    Mr. Davis's face, which was not a kick to his head or face at

3    all.  It was a kick to his brachial plexus tie-in.

4       Q.   And was that kick to the brachial plexus tie-in

5    effective?

6       A.   It was ineffective in the sense that we were not able to

7    get him arrested, and it was ineffective in that Mr. Davis

8    eventually made it back to his feet.  I'm not sure how I

9    documented it on my use-of-force report, but I would say it was

10   ineffective overall.

11      Q.   What happened after you kicked him in the brachial

12   plexus tie-in?

13      A.   At this point Mr. Davis got -- he ended up getting back

14   to his feet.  Officer Connair and Officer Everhart are for sure

15   in the store at this time.  And I believe shortly after they're

16   in the store, again, we're pushing him back in the store.  That

17   way he cannot escape or flee.  At this point in time I started

18   considering other options because I had now stricken Mr. Davis

19   five times, all ineffective.  So I started considering what

20   other options did I have.  And I took a step back to think,

21   okay, this is going to be an actual struggle.  The things that

22   I heard about Mr. Davis from Officer Baker, unfortunately, are

23   appearing to be true.

24           And I just started trying to assess and figure out what

25   can we do.  How are we going to get this man under handcuffs

35

1    with nobody getting seriously hurt?  I believe at that point in

2    time the initial video from Mr. Woodson-Levey, the short video,

3    I think that's where I started to pick that up because I

4    remember being in the back and just kind of having my hands on

5    one of the other officers just trying to assist and push to

6    keep Mr. Davis inside of the store.

7        Q.    Did you observe when Officer Connair -- strike that.

8              What type of movements did you observe Mr. Davis do

9    while you were assisting another officer?

10       A.    So it appeared that -- just the reference back to

11   football.  It appeared Mr. Davis was trying to break tackles.

12   It appeared Mr. Davis was trying to exit the store, wrestling,

13   things of that nature.  Now he wasn't wrestling like WWF which

14   you see on Monday nights.  But as far as wrestling, he was not

15   complying with us officers as far as us getting him into

16   handcuffs, just making violent motions, pushing, doing whatever

17   he could, trying to get out of the grasp of all the officers in

18   the store.

19             At the same time, same things like I didn't do anything,

20   Officer, which we saw on video.  I didn't do anything.  Why?

21   In my head at the time it was registering that this is -- this

22   is actually coming to -- this is actually what I heard, that

23   the resistance, the fleeing, the something along the lines of

24   being a sovereign citizen and not having to follow law, it was

25   just like --

36

1          MR. SIDOTI:  Objection.

2          THE COURT:  Basis?

3          MR. SIDOTI:  Your Honor, it's facts not in evidence

4     regarding what Mr. Morefield just identified about sovereign

5     citizen and the like.

6          THE COURT:  Sidebar.

7                              - - -

8       (The following proceeding was held at sidebar.)

9          THE COURT:  Ms. Noble, I didn't understand the answer.

10    That's why I was -- stayed back.  I was trying to -- I'm going

11    to reemphasize my request that, you know, both Morefield and

12    Johnson have interesting narratives that I'm going allow you to

13    get before this jury.  It's part of your background.  But I

14    don't want it in narrative form.

15          Now, Officer Morefield misunderstood what I said at the

16    end of our session yesterday and thought it impacted on the

17    testimony that he was giving.  It's incumbent upon you as trial

18    lawyers to break this up.  So please try to honor my ruling,

19    and let's dispense with the narratives because it really does

20    lose you.  It's like your parents reading to you at bedtime.

21    They do that to put you to sleep in addition to give you

22    information.

23          MR. SIDOTI:  Your Honor --

24          THE COURT:  Go ahead.

25          MR. SIDOTI:  Judge, I feel like I'm getting to the

1    point where I'm policing a free-for-all in these narratives,

2    number one.  Number two, that response, I'm going to ask for an

3    instruction.  His testimony what he just responded to the

4    question was, what I heard from Officer Baker was true, he

5    doesn't follow the law.  And maybe as you dealt with them in

6    some of the criminal matters, people who claim to be a

7    sovereign citizen, there's some sort of UCC protection.  I'm

8    not going to go into it --

9         THE COURT:  Those are like the posse comitatus.  Is

10   there any evidence that Mr. Davis is a member of the posse

11   comitatus?  I've had a number of those cases before me.  If

12   Mr. Davis is in the posse comitatus or otherwise a tax

13   protester, he would be the first African American with a

14   criminal record whom I ever had in my court who is a part of

15   that group.  But he may be.  Do you have any evidence that he

16   is?

17        MS. NOBLE:  First, I had no idea that Sergeant

18   Morefield was going to go there.  I had never heard that

19   comment.

20        THE COURT:  I'm striking that.  I will strike it as

21   unresponsive because it wasn't in response to your question.

22   But what I want to do with you and your -- with your input,

23   Ms. Noble, your input, Mr. Sidoti, is go back and look at the

24   answer.  And I think it's the last two sentences where he

25   becomes unresponsive.

38

1          Ms. Evans, read back his answer.

2      (Thereupon, the last answer was read by the court

3  reporter.)

4          THE COURT:  I'm going to begin with "in my head."

5  From there on, I'm going to instruct the jury to disregard as

6  unresponsive.

7          MS. NOBLE:  To answer your other question about

8  whether or not there's any evidence of Mr. Davis being a

9  sovereign citizen, yes, I have it.  I did not bring it up.  I

10 did not think it was related, but I did want to answer your

11 question.

12         THE COURT:  Certainly it's not responsive to your

13 question.

14         MS. NOBLE:  I agree.

15         THE COURT:  Thank you.

16         MS. GELSOMINO:  What's that evidence?  As long as it

17 doesn't come in.

18         MS. NOBLE:  I have no intention of bringing it in.

19         MS. ROSENBERG:  But it was in your discovery.

20         MS. NOBLE:  It was in your discovery.

21         THE COURT:  You all can talk about that later.

22     (The following proceeding was held in open court.)

23         THE COURT:  Ladies and gentlemen, you are instructed

24 to disregard the following portion of Sergeant Morefield's

25 testimony as it was unresponsive to the question.

39

1    I'm trying to get to it.

2    "At the same time, same things like I didn't do

3  anything, Officer, which we saw on video.  I didn't do

4  anything.  Why?  In my head at the time it was registering that

5  this is -- this is actually coming to -- this is actually what

6  I heard, that the resistance, the fleeing, the something along

7  the lines of being a sovereign citizen and not having to follow

8  law, it was just like --"

9    All of that is to be disregarded as unresponsive to

10 Ms. Noble's question.

11    Please continue, Ms. Noble.

12    MS. NOBLE:  Thank you, Your Honor.

13 BY MS. NOBLE:

14 Q.    Sergeant Morefield, around the time of that first video

15 from Mr. Woodson-Levey by the refrigerated section and the -- I

16 want to say like the chips and the pop section?

17 A.    Yes, ma'am.

18 Q.    In that aisle, did you hear Mr. Davis say anything?

19 A.    Yes.  What I thought I heard Mr. Davis say multiple

20 times and throughout is:  I didn't do anything.  I didn't do

21 nothing.  What did I do?

22    I had multiple conversations with Mr. Davis during the

23 struggle, and Mr. Davis repeated the same thing:  I didn't do

24 anything, Officer, I didn't do anything, sir, things along

25 those lines.

40

1    Q.   And did you believe that he was resisting at this time?

2    A.   I absolutely believe, again, without a doubt in my mind

3    that Mr. Davis was resisting at this time.

4    Q.   Shortly after -- actually, strike that.

5         How long after the video, that very short clip from

6    Mr. Woodson-Levey where you can see Officer Connair fall into

7    the soda, how long after that did you move to like the register

8    part area?

9    A.   Are you referring to the second video?

10   Q.   Yes.

11   A.   So following Officer Connair being pushed or tackled

12   into the can of soda by Mr. Davis to the second video, it's

13   hard to say how much time had elapsed, but I would say not more

14   than a minute.

15   Q.   And did you give any commands during this time to

16   Mr. Davis?

17   A.   I gave Mr. Davis commands from the beginning throughout

18   the entire -- throughout the entire interaction until we had

19   handcuffs on him.  My voice is the one that could be heard

20   throughout having the conversation with Mr. Davis when he's

21   asking what did he do.

22        I said, because you're not complying.  Stop resisting.

23        But I didn't do anything.

24        Yes, you are.  You're not complying.  Resisting stop.

25        That is my voice you hear.  I gave Mr. Davis commands

41

1    throughout the entirety of this incident.

2    Q.    What was Mr. Davis's response to your commands?

3    A.    Multiple times:  But I didn't do anything, Officer.  I

4    didn't do anything, sir.  What did I do?  I'm not doing

5    anything.

6         It was just repetitive, the same things over and over.

7    Q.    What actions was he doing in response to your commands?

8    A.    Not complying with our commands, trying to get out of

9    the grasp of all officers, trying to get out of the grasp of

10   being arrested and not allowing us to put his hands behind his

11   back.

12   Q.    We see in that longer video, the roughly four-and-a-half

13   minute video, you move a chip stand.  Why did you move the chip

14   stand?

15   A.    In the video you can see I actually -- my attention --

16   my attention is taken away from the struggle with Mr. Davis.

17   And the reason being I was sitting there, I kind of had my

18   hands on Officer Johnson's back as Officer Johnson is trying to

19   put Mr. Davis into handcuffs.  My attention was taken away

20   because I started hearing feet shuffling.  And I'm looking who

21   is coming through the threshold.

22        As I said in the beginning, the door to the market was

23   propped open and there were people standing in the door, some

24   of them almost standing like a track stance.  Again, my

25   attention was taken away because, as soon as I saw that, it

42

1    provides a huge safety issue to not only to Mr. Davis but to

2    officers and everyone in the store as I don't know who these

3    people are.  They're not officers.  I don't know if they're

4    with Mr. Davis.  I don't know if they want to cause harm to us.

5    I don't know what they are.

6           With us having so much attention on Mr. Davis, you see

7    me step off of camera for a minute and actually tell them move,

8    get away from this doorway.  And I actually move the prop that

9    kept the door open.

10          As this is going on, I'm also hearing things going on

11   inside the store, which in the video it appeared to be

12   Mr. Woodson-Levey arguing with one of the store owners.  I'm

13   hearing that commotion which took my attention away because

14   I -- again, things started -- I started realizing this isn't

15   going to be quick, it doesn't appear to be.  And I started

16   looking around like who else is in the store?  Is somebody

17   going to cause harm to us?

18          I hear the commotion.  I see this guy standing over

19   there.  And as he's standing over there, just like, okay, it

20   just made sense for me to set a barrier.  That way he cannot

21   come through it.  He cannot try to assist Mr. Davis.  He cannot

22   try to harm us or harm Mr. Davis, and also for his safety as it

23   was unknown what was going to take place at this point in time.

24          I had never been in a struggle like this.  I never been

25   in one since.  So at the point in time I thought it was best to

43

1    create as much space as possible and keep any patrons,

2    civilians, employees, or whoever back far enough from us

3    because there was no telling what was going to happen.  There

4    was no telling what was going to be produced, if anything at

5    all; so, as a result, just to keep people back away from the

6    struggle for their safety, for our safety, for Mr. Davis's

7    safety.

8        Q.   After you moved the chip rack, what's the next use of

9    force that you use on Mr. Davis?

10       A.   I would call it a level one use of force which is our

11   lowest level of actual force.  That is when I grab Mr. Davis by

12   his dreadlocks and assist Officer Johnson in placing Mr. Davis

13   back on the ground.

14       Q.   Just so we have the time frame, is that when Officer

15   Johnson does the double leg takedown?

16       A.   Yes, yes, when Officer Johnson does the double leg

17   takedown of Mr. Davis.

18       Q.   And what is -- what did you do after Mr. Davis was back

19   on the ground?  This is the portion -- this is on that longer

20   video when he's back on the ground.  Are you in that video at

21   that point?

22       A.   I think I'm in the video at the beginning, and you can

23   see me grabbing Mr. Davis by his dreadlocks and assisting

24   Officer Johnson as he's performing a double leg takedown.  Once

25   Mr. Davis is on the ground, I notice myself and other officers

44

1   doing exactly as we were trained which is heading to the

2   different stations of Mr. Davis's body.

3   Q.   So once he is on the ground, what part of Mr. Davis's

4   body do you take control of?

5   A.   I take control of Mr. Davis's head.

6   Q.   Were you able to control his head?

7   A.   For the most part.  I was unsuccessful at times, as I

8   was posting my entire 220-pound body to Mr. Davis's dreadlocks

9   in an attempt to keep his head flat on the ground.  And

10  Mr. Davis was still able to get back to the position that has

11  been referred to many times where he's on his knees, has his

12  knees underneath him and his hands underneath his body.

13  Q.   What were you doing while now Sergeant Bennett was

14  cycling the taser?

15  A.   There was a lot of time that elapsed from what I just

16  stated to when Sergeant Bennett was cycling the taser.  I was

17  doing the same thing the entire time, giving Mr. Davis commands

18  as he was trying to get up.  You can clearly hear in the video

19  don't get up, if you roll over, I'm going to knee you in the

20  face, things along those lines, in an attempt to keep Mr. Davis

21  where he was at.

22       I said successful at times because, overall, I was able

23  to keep Mr. Davis's head there.  He did not completely get up

24  as I was literally posting my entire weight trying to hold on

25  for my life, per se, to keep Mr. Davis on the ground so he

45

1   could not get back on his feet. That went on for minutes as

2   I'm giving commands throughout the entirety, as heard in the

3   video.

4        Once Sergeant Bennett comes in and tases him, I'm doing

5   the same thing, controlling his head, trying to keep him down,

6   as I see the other officers doing exactly as we were trained

7   with what we would call a maximum resister.

8   Q.   Why would you call Mr. Davis a maximum resister?

9   A.   Because Mr. Davis did whatever he could to resist

10  arrest. Mr. Davis at no point in time complied. We finally

11  got handcuffs on Mr. Davis because Mr. Davis was completely

12  exhausted at the time. That's why I would call Mr. Davis a

13  maximum resister.

14  Q.   What did you do once Mr. Davis was finally in handcuffs?

15  A.   Once Mr. Davis was finally in handcuffs, I took a deep

16  breath, kind of a sigh of relief. As you can see in I believe

17  it's Officer Lemak's video, I was huffing and puffing, was

18  taking deep breaths, sighs, just glad the encounter had ended.

19  Q.   You've heard the testimony of other witnesses in this

20  case; is that correct?

21  A.   Yes, ma'am.

22  Q.   Do you remember Mr. Woodson-Levey alleging that he heard

23  someone use the N word?

24  A.   Yes, ma'am, I do.

25  Q.   Did you or anyone on your team use that word?

46

1     A.    Absolutely not.

2     Q.    What would you have done if you heard one of your team

3  use that word?

4     A.    I would have done what I have done in the past, and that

5  is to report any officer who uses that word.  I would have

6  reported them, as I have in the past, complained on them, and

7  it would end up being in a lawsuit as it is right now.

8     Q.    Is that the lawsuit with Lieutenant McFadden?

9     A.    Yes, because Lieutenant McFadden actually called me that

10  word and I complained on her for it.

11         MR. SIDOTI:  Objection.  Hearsay.  But it's been

12  answered.  So I'll withdraw it.

13         THE COURT:  All right.  Please continue, Ms. Noble.

14         MS. NOBLE:  Thank you, Your Honor.

15  BY MS. NOBLE:

16     Q.    You were also able to sit through Dr. Taylor's

17  testimony; is that correct?

18     A.    Yes.

19     Q.    Did you hear him reference a pig pile during his

20  testimony?

21     A.    I did.

22     Q.    How did that make you feel?

23     A.    Pretty disgusted.  It's a derogatory term.  It's a term

24  that has never shed positive light on police officers.

25  Although being a police officer isn't a race or a gender or

47

1    anything of that nature, but it would be equivalent of calling

2    a race a derogatory term or gender a derogatory term.  That's

3    the derogatory term for police officers.

4    Q.   You heard testimony or allegations that the officers

5    were exacting revenge due to the Officer McKeon incident.  Can

6    you speak to that?

7    A.   I can speak to that.  That's not true.  That's not the

8    culture of our division, and it's not something that we take

9    into consideration for emotional purposes.  I can't speak for

10   every officer, but I can speak for the majority of officers in

11   saying -- I can't put words in their mouth, but the culture

12   that I know and what I see to be true is we -- like the way we

13   are -- just an example, I didn't know Officer McKeon.  I have

14   no -- I care that that happened to Officer McKeon.  I'm glad he

15   is alive and wasn't seriously injured.

16            MR. SIDOTI:  Objection.

17            THE COURT:  Sustained.

18   BY MS. NOBLE:

19   Q.   Why did you use the forces you used against Mr. Davis?

20   A.   Because Mr. Davis did not comply with the command, and

21   Mr. Davis was resisting arrest and he didn't comply with our

22   commands.  He tried to avoid us placing handcuffs on him.

23   Q.   You were also able to sit through Mr. Davis's testimony;

24   is that correct?

25   A.   Yes.

48

1    Q.   Did you hear him speak that he thought he was being

2    robbed?

3    A.   I did.

4    Q.   In your experience in the robbery unit, how do robberies

5    against an individual usually happen?

6         MR. SIDOTI:  Objection.

7         THE COURT:  Sustained.

8    BY MS. NOBLE:

9    Q.   Can you -- are you familiar with the Livingston Market?

10   A.   I am.

11   Q.   Are you familiar with that area?

12   A.   I am.

13        MS. NOBLE:  May I have a moment to confer with

14   counsel, Your Honor?

15        THE COURT:  Yes, you may.

16        MS. NOBLE:  Thank you.  No further questions at this

17   time.  Thank you.

18        THE COURT:  Thank you, Ms. Noble.  Ladies and

19   gentlemen, it's 10:50.  Since we got started a little later, we

20   just continued through.  We'll stand in recess until 11:05.

21     (Recess taken from 10:50 a.m. to 11:14 a.m.)

22     (Jury in at 11:14 a.m.)

23        THE COURT:  Mr. Sidoti, are you ready to proceed with

24   cross?

25        MS. SALLEY:  I am, Your Honor.

49

1        THE COURT:  Please proceed.

2        MR. SIDOTI:  Thank you, sir.

3                    - - -

4              RECROSS-EXAMINATION

5   BY MR. SIDOTI:

6   Q.    Sergeant, hello again.

7   A.    Good morning.

8   Q.    During your direct examination, I just kept track in

9   regards to some of the testimony you gave regarding Mr. Davis's

10  conduct.  And during your direct testimony, you used the word

11  violent 12 times as you were answering questions from your

12  attorney.  Do you recall that?

13  A.    I do.

14  Q.    What's your definition of the word violent?

15  A.    Aggressive.

16  Q.    Well, if somebody uses the word violence, what does that

17  mean to you?

18  A.    They're aggressive.

19  Q.    Do you think they're synonymous?

20  A.    To an extent.

21  Q.    Violence, would it surprise you, is defined like death,

22  serious physical harm or death?  It's violent, right?

23        MS. NOBLE:  Objection.

24        THE COURT:  Basis?

25        MS. NOBLE:  Hearsay.

50

1       THE COURT:  I'm going to sustain it based on form of

2   the question and lack of background for where that definition

3   that Sidoti used came from.  So your objection is sustained.

4   BY MR. SIDOTI:

5   Q.    Sergeant, will you look to your right?  I'm going to ask

6   you to review a document I want to ask you some questions

7   about.  It's been previously identified as Plaintiff's Exhibit

8   144 for the record.  I just want you to read it to yourself

9   after you've identified the document, please.

10  A.    The narrative or --

11  Q.    Yes, sir.  The narrative -- first page doesn't contain

12  the narrative, but pages 2 through 4 if you would read through

13  those, please.

14  A.    I'm finished, Mr. Sidoti.

15  Q.    Thank you, sir.  Can you point out to me one place in

16  that entire use-of-force report that you ever identify that

17  Mr. Davis used the phrase officer to identify the fact, as

18  you've testified, that he knew that he was being assaulted by

19  police officers?

20  A.    Can you repeat that question?

21  Q.    Can you identify in that use-of-force report anywhere

22  where you told your superior officers that Mr. Davis ever used

23  the word officer to identify, as you've testified, that he knew

24  he was being assaulted by police officers?

25  A.    Sir, this document is --

51

1    Q.   Sir, please answer my question.

2    A.   I am answering your question.  This document is just to

3    document my uses of force.

4    Q.   My question is, in a use-of-force report that you just

5    reviewed, do you recall in there that you wrote down quotes

6    allegedly stated by Mr. Davis, things that he said?

7    A.   I do.

8    Q.   Do any of those quotes contain the fact that he used the

9    word officer to identify for this jury that he would have known

10   he was being assaulted by police officers?

11   A.   Again, that's not what goes in this document.

12          THE COURT:  Sergeant Morefield, as I instructed other

13   witnesses, you have to answer the question asked.  And you will

14   have an opportunity to explain it.  So I want you to feel

15   confident that you can explain your answer, but you have to

16   answer the question asked.

17          THE WITNESS:  No.  To answer your question, no.

18   BY MR. SIDOTI:

19   Q.   Do you identify anywhere in that document -- strike

20   that.

21          You've told the ladies and gentlemen of the jury that

22   you, according to your use-of-force report that you just

23   reviewed, wrote in there in some portion some specific things

24   you're claiming Mr. Davis said to you while he was being

25   assaulted, correct?

52

1    A.    That's a long question.  Can you repeat it?

2    Q.    Yes.  Inside of that report you just reviewed, do you

3  identify allegations of things you said Mr. Davis quoted during

4  the time he was being assaulted by law enforcement in this

5  incident?

6    A.    I don't recall.  I can read it again if you'd like.

7    Q.    Let's just go to the last page, for example.  Excuse me.

8  Page 2, the very last sentence.  Officer Morefield heard

9  Mr. Davis say, quote, no, I didn't do anything, end quote,

10  correct?

11    A.    On page four of six.

12    Q.    The bottom stamp should say 43.

13    A.    Mine says 45.

14    Q.    Page 2, if it says 43 on the bottom left?

15    A.    Yes.

16    Q.    Do you see that quote?

17    A.    I do.

18    Q.    It's in quotes, correct?

19    A.    It is.

20    Q.    Just so we can clarify, in your use-of-force report, you

21  identified some things that you're alleging Mr. Davis said in

22  quotations, comments made by him, correct?

23    A.    Yes, which caused me to use force.

24    Q.    Great.  You can add that if you want to.  But my

25  question is there were quotes that you specifically made that

53

1   you're claiming Mr. Davis made during this interaction, yes?

2   A.   And I said, yes, which caused me to use force.

3   Q.   "Officer" is never in there, is it, that you claim was

4   stated by Mr. Davis?

5   A.   Mr. Davis stating "officer" did not require me to use

6   force.

7   Q.   Or "sir," correct?

8   A.   Same.

9   Q.   I mean, a dispute, you'd agree, from two weeks of

10  testimony now is the fact that Mr. Davis was disoriented,

11  didn't know who was there, claimed he got robbed.  So at issue

12  is if you announced yourself and he knew you were police.

13  Would you agree with that?

14  A.   Please repeat that one more time.

15  Q.   Would you agree that a fact at issue is if Mr. Davis

16  knew that you were police officers before he got struck 51

17  times?

18  A.   I would agree.

19  Q.   So that's at issue in this case, correct?

20  A.   I'd say it was brought up in this case, yes.

21  Q.   Well, this is your second time testifying, correct?

22  A.   That's accurate.

23  Q.   And on direct for the first time of all your testimony,

24  you made allegations that Mr. Davis acquiesced the fact that

25  law enforcement was there by saying, Officer, I didn't do

54

1   anything, or, sir, I didn't do anything, correct?

2   A.   Sir, if possible, plain English.  I'm not sure what

3   acquiesce means.

4   Q.   For the first time, your testimony was that Mr. Davis

5   knew that he was being struck by officers because, according to

6   your testimony for the first time, he was saying, Officer, I

7   didn't do anything; sir, what did I do, correct?

8   A.   Something to that extent, yes.

9   Q.   You didn't say that the first time you testified,

10  correct?

11  A.   I wasn't asked that the first time.

12  Q.   Did you hear Connair's testimony yesterday?

13  A.   I did.

14  Q.   Officer Connair makes -- gives his narrative that for a

15  significant period of time near the door that he's wrestling

16  with Mr. Davis, that he's got his arms and his head in.  Do you

17  recall that testimony?

18  A.   Somewhat.

19  Q.   And then your testimony is that you have Mr. Davis into

20  like your chest area where you're delivering the knees while

21  he's struck near the door area, correct?

22  A.   Correct.

23  Q.   And then Officer Johnson also testified and says that he

24  has a grasp on Mr. Davis and is actually wrestling around with

25  him, that he's actually shoved to the door.  Do you recall

55

1   that?

2   A.   I do.

3   Q.   How could Mr. Davis be in three different places at the

4   same time?

5   A.   So --

6   Q.   At the door area?

7   A.   Sir, if you recall my testimony, my counsel clearly

8   asked me was Officer Connair, Officer Everhart there when I

9   delivered those strikes. And my response was I do not recall

10   them being there, just Officer Johnson. Was that clearly

11   answered for you?

12   Q.   When you guys were at the door, is that what you're

13   speaking of?

14   A.   I'm speaking of what you just asked me.

15   Q.   So four officers were at the doorway of the only place

16   to get in and out of this store where Mr. Davis, off camera,

17   sustains at least six strikes to the head but, yet, he is in

18   the chest and body area of three of the four officers?

19   A.   Is that a statement?

20   Q.   That's a question.

21   A.   Can you reask it?

22   Q.   Sure. Would you agree with me that during this door

23   interaction where Mr. Davis is allegedly in the store and goes

24   back towards the entrance and exit of the establishment, that

25   in that area he is struck six times by three different

56

1    officers?

2    A.   According to testimony, but I can't testify that I

3    witnessed that or I observed that day of.

4    Q.   You didn't see anybody else strike Mr. Davis at the

5    door?

6    A.   I didn't see anybody strike Mr. Davis in the door or at

7    the door.

8    Q.   You take your oath as a police officer seriously?

9    A.   Absolutely.

10   Q.   How about your oath in this courtroom today?

11   A.   Absolutely.

12   Q.   And for the last two weeks?

13   A.   Absolutely.

14   Q.   You think you can tell the truth when you feel like it?

15   A.   No.

16   Q.   Do you think it's important for the integrity of this

17   jury that you tell the truth about all aspects of this case and

18   anything you're asked to that's not overruled by this Court?

19   A.   Without a doubt.

20   Q.   You and I had a conversation last week about this

21   Facebook instance that took place some six months prior to the

22   utilization of Facebook for Mr. Davis's arrest.  Do you recall

23   that?

24   A.   Briefly.

25   Q.   There was a whole investigation done on that, and you

57

1    and I had a whole exchange of questions and answers regarding

2    it.  Do you recall that?

3     A.    Briefly.

4     Q.    Well, let's talk about what you do remember.  I asked

5    you questions regarding how Mr. Davis got to the store that

6    day.  Do you recall that?

7     A.    I do.

8     Q.    Right.  And I'll move on in a moment, but this sense of

9    urgency about we found out last minute or whatever, you knew

10   Mr. Davis was going to this store, correct?

11    A.    Right before he went there, yes.

12    Q.    Based on the Facebook exchange, correct?

13    A.    Based on the text message exchange.

14    Q.    And you, in your report, wrote something to the lines of

15   a confidential informant is where we got the information to

16   know that Mr. Davis was going to be at the market?

17    A.    That's inaccurate.  I did not write a report.

18    Q.    Information in the investigation for Mr. Davis's case

19   yielded the fact that you put in information that said we found

20   out Mr. Davis was going to be at the market from a confidential

21   informant.  Do you recall that testimony?

22           MS. NOBLE:  Objection.

23           THE COURT:  Overruled.

24           THE WITNESS:  Can you repeat that, please?

25

58

1    BY MR. SIDOTI:

2    Q.    Officer, we talked about that last week.

3    A.    I'm asking you to repeat it.

4    Q.    I'm asking you about your report that you indicated that

5    you and your team, on September 1st, 2017, knew that Mr. Davis

6    was going to be at the market based on information that you got

7    from a confidential informant.  Do you recall that questioning?

8    A.    I recall testifying that I did not write the arrest

9    report.  That's what I recall.

10   Q.    The information that contained the allegation that

11   Mr. Davis was going to be at the market and that the

12   information came to your knowledge by means of a confidential

13   informant, did you disclose that information to your superior

14   officers regarding this investigation?

15   A.    I don't recall exactly what was disclosed.  What I do

16   recall is me testifying that our chief legal advisor advised

17   that that information is not facts relevant to the case;

18   therefore, it did not need -- it did not need to be included in

19   any arrest paperwork.

20   Q.    Right.  We talked about this.  You use the word omitted,

21   correct?

22   A.    Absolutely.

23   Q.    You told this jury that your legal advisor -- and you

24   gave up that privilege -- told you to leave that out, to omit

25   the fact that you used Facebook to get to Mr. Davis, correct?

59

1    A.    Yes.

2    Q.    Right.  You told this jury that from the other

3    instance -- maybe you used the phrase blanket policy, that

4    based on the prior instance, that you had been advised by him

5    to omit the utilization of Facebook, to use the word omitted,

6    correct?

7    A.    I did.  I said that I could.  I don't want to

8    mischaracterize.

9    Q.    But you told this jury that you were told that by your

10   lawyer, right?

11   A.    Our division's chief legal advisor, which up until we

12   were in court I did not know that he was considered my lawyer

13   as an employee.  I thought he just gave us advice on how to do

14   our job.

15   Q.    Sergeant, we had this interaction where I asked you an

16   omission to leave something out is much different than putting

17   different information in.  Do you recall that?

18   A.    I recall that.

19   Q.    So just so we're clear, you told this jury under oath,

20   as a cop under oath in this courtroom, that the reason you

21   didn't put the Facebook information in there was because you

22   were advised by your lawyer to omit it because it wasn't

23   important to the facts?

24   A.    That's inaccurate.

25   Q.    That's what you told them?

60

1    A.   No.  I told them I did not submit a report.  I never

2    entered that into a report.  That's what you told them.

3    Q.   I asked you if you disclosed the means that you knew

4    that Mr. Davis was going to be at the market was by means of a

5    confidential informant.  Do you recall that questioning?

6    A.   I do.

7    Q.   Why else would I get into it unless you wrote it down?

8    A.   Sir, disclosing and entering it into a report are two

9    different things.

10   Q.   Regardless, let's stick with the disclosure.  You

11   disclosed that the way that you knew Mr. Davis was going to be

12   at the market was because of a confidential informant.  Did you

13   disclose that?

14   A.   No.  I disclosed what actually happened, and then I also

15   disclosed what was to be omitted per our chief legal advisor.

16   Q.   So regardless, your testimony to this jury is the reason

17   that you said confidential informant or omitted the Facebook is

18   because you were advised by your chief legal counsel to do so,

19   correct?

20   A.   Correct.

21        MR. SIDOTI:  May I approach, Your Honor, the witness?

22        THE COURT:  Yes, you may.

23        MR. SIDOTI:  I'm going to show you what's been marked

24   as Plaintiff's Exhibit 180.

25

61

1    BY MR. SIDOTI:

2    Q.    You don't have to read the entire document, Sergeant,

3    but I want you just to look at it for a moment.

4    A.    Each document?

5    Q.    Can you just flip through that document, all the pages,

6    and identify what it is?

7    A.    I'm familiar with it.

8    Q.    Can you identify what that is?  May I have it back,

9    please?

10   A.    Absolutely.  It is the routeing sheet and the

11   investigation into the 2016 initial Facebook arrest that

12   Mr. Sidoti referenced.

13   Q.    Six months prior to the arrest of Mr. Davis, correct?

14   A.    That's inaccurate.  Mr. Davis was arrested

15   September 1st, 2017.  That was in 2016 sometime, and that was a

16   year and some change prior to that.

17   Q.    I apologize.  From the day recorded.  August 2nd of

18   2016.  Does that sound more familiar?

19   A.    Over a year, yes.

20   Q.    So we dealt -- you have dealt with the specific issue

21   regarding Facebook as we discussed during your adverse direct

22   by the plaintiff's table, correct?

23   A.    That's accurate.

24   Q.    And this is in part what we discussed when you indicated

25   that you omitted the facts of utilizing Facebook and how you

62

1   found Mr. Davis because you were advised by your chief legal

2   counsel, correct?

3    A.   Yes.

4    Q.   Did you see that he was investigated in this case?

5    A.   That who was investigated?

6    Q.   That is your -- strike that.

7         Did you note that Mr. Furbee was interviewed by your

8   supervising officer regarding the allegations in your Facebook

9   utilization in this 2016 case?

10   A.   I noted that Mr. Furbee, our chief legal advisor, was

11  interviewed by the IA sergeant conducting the investigation.

12   Q.   Specifically regarding what you told this jury, the

13  reason that that information was omitted, correct?

14   A.   Can you repeat that?

15   Q.   Mr. Furbee was asked specifically about you claiming

16  that he told you to omit the Facebook information from the

17  facts.  Are you aware of that?

18   A.   Am I aware at what point?

19   Q.   Are you aware that when this investigation for the 2016

20  Facebook investigation against you was done, that your superior

21  officer interviewed Mr. Furbee regarding your allegation that

22  he had told you to omit the information about Facebook to the

23  facts of that case?

24   A.   I'm aware, which led to the exoneration.

25   Q.   After a DCC, though, correct?

63

1   A.   Negative.  I grieved the DCC and our deputy chief, who

2   is the final arbiter, disagreed with the acting deputy chief,

3   which was a commander who recommended discipline.  The

4   commander can't issue.  He can only recommend.  The deputy

5   chief, which was Chief Kebbler at the time, disagreed and I was

6   exonerated.  It's actually in there, if you open it up.

7   Q.   Similar to what Bash did in regards to Reffitt's use of

8   force, right?

9            MS. NOBLE:  Objection.

10           THE COURT:  Sustained.

11  BY MR. SIDOTI:

12  Q.   Is that a similar process is what I'm asking?

13  A.   It is not.

14  Q.   I want to be clear so the jury is clear.  A

15  recommendation was made that you, in essence, get sanctioned.

16  You were.  You appeal it to your chain of command and then you

17  got exonerated, correct?

18  A.   I can clarify.

19  Q.   I just want you to answer my question.  Do I have it

20  correctly?

21  A.   No.

22  Q.   I'm going to show you an unredacted page.

23           MR. SIDOTI:  If I may approach, Your Honor?

24           THE COURT:  Yes.

25

64

1    BY MR. SIDOTI:

2    Q.   Page 194 of Plaintiff's Exhibit 180.  If you could

3    briefly look at the highlighted area, Sergeant.

4         Let me know when you're done with that, please.

5    A.   You say just the highlighted portion?

6    Q.   Sure.  Did you read it?

7    A.   I did.

8    Q.   May I have that.  Your lawyer, your chief legal counsel,

9    was interviewed by your superior officer during this 2016

10   Facebook and indicates that he never told the officer that the

11   Facebook information should be omitted from the statement of

12   facts.  Is that on this document?

13   A.   That is on the document.

14   Q.   So you just told this jury for two weeks that you were

15   advised by your lawyer to omit the Facebook information, and

16   your legal counsel that you referenced on that stand under oath

17   wrote in a report that he never told you that?

18   A.   I just testified to this jury today and last Monday that

19   our chief legal advisor stated that I could omit the

20   information --

21   Q.   Come on.

22   A.   -- which led to the exoneration.

23   Q.   Sergeant, you told this jury, when I asked you ad

24   nauseam about why you would put CI because it's not an

25   omission, you said you were advised by your lawyer to omit that

1  information because it dealt with tactical information.  Do you

2  recall that testimony?

3   A.   That I could.  I disagree.

4   Q.   That you could?

5   A.   That I could.  I'm speaking English, sir.

6   Q.   Fine.  If you could then you didn't omit it, then it's

7  just a flat lie.  If it's not an omission, then you put in

8  false information.  Which one is it?

9          MS. NOBLE:  Objection.

10          THE COURT:  Sustained.

11   BY MR. SIDOTI:

12   Q.   Is there any other lies you want to clarify for this

13  jury in week two of trial, Sergeant?

14          MS. NOBLE:  Objection.  Argumentative.

15          THE COURT:  Sustained.

16   BY MR. SIDOTI:

17   Q.   Can you tell me where the use of force policy tells you

18  that you can rip people's hair out of their head?

19   A.   It doesn't state that under any circumstances.

20   Q.   Did you rip Mr. Davis's hair out of his head when you

21  were pulling him down by his dreads?

22   A.   I saw Mr. Davis's dreadlocks in the store.  So I assume,

23  since I had ahold of his head and he was trying to jerk away,

24  that it was me that caused his dreadlocks to come out of his

25  head.

66

1    Q.   When he was trying to jerk away in that portion of the

2    video?

3    A.   He tried to jerk away the entire video.  We seen it ad

4    nauseam.  There's no debating that.

5    Q.   We've already asked the question several times.  You

6    understand that as an officer, you have to justify every single

7    use of force you deliver.  Do you understand that?

8    A.   I understand it more than most being a defensive tactics

9    sergeant.

10   Q.   So when you rip Mr. Davis's hair out of his head, his

11   pants were already at his ankles and he had just been struck

12   twice in the face by Officer Connair.  Do you recall that in

13   the video?

14   A.   I recall that in the video.

15   Q.   Was he jerking away or was he just punched twice in the

16   face with handcuffs?  Or was it both?

17   A.   It was a multitude of things.

18   Q.   You think, as an officer, that the public gives you a

19   little bit more trust because you're behind that badge?

20   A.   I'd say.

21        MS. NOBLE:  Objection.

22        THE COURT:  Sustained.

23   BY MR. SIDOTI:

24   Q.   During your direct examination Ms. Noble was asking you

25   questions about football status.  Do you recall that?

67

1    A.    Football status?

2    Q.    Like you were a D1 athlete that received national

3    recognition for courage and whatever you got from the Rudy

4    award, correct?

5    A.    That's accurate.

6    Q.    So when she was making reference to Mr. Davis's tenure

7    in Little League football, those two really aren't the same

8    thing, are they?

9              MS. NOBLE:  Objection.

10             THE COURT:  Overruled.

11             THE WITNESS:  Football is football.  But if you're

12   regarding the level of skill, they're nothing alike.

13   BY MR. SIDOTI:

14   Q.    If you claim you're given the option that you could omit

15   the information, what do you think that means in regards to

16   either telling the truth or strictly omitting it?

17   A.    The difference between omitting and lying is the

18   omission is as long as it's not relevant to the case.  That's

19   the way I understood it.  That's the way the definition reads.

20   That's what took place.

21        The Facebook arrest in 2016, Facebook was irrelevant to

22   the facts of the case.  And the event of Mr. Davis resisting

23   arrest, Facebook had nothing to do with Mr. Davis resisting

24   arrest, zero.  He had warrants.  It had zero to do with it.

25   Q.    You know what it deals with, Sergeant?  It deals with

68

1    your credibility.  Would you agree with that?

2              MS. NOBLE:  Objection.

3              THE COURT:  Overruled.

4              THE WITNESS:  Not at all.

5      BY MR. SIDOTI:

6      Q.   You told this jury that the reason you were allowed to

7    omit information that we find out months later, years later

8    where you're five years removed, that you utilized a

9    confidential informant in his case as opposed to you doing

10   Facebook on another false Facebook handle was because you claim

11   you were advised by a lawyer to do it, right?

12             MS. NOBLE:  Objection, Your Honor.  May we have a

13   sidebar?

14             THE COURT:  Yes.

15                          – – –

16      (The following proceeding was held at sidebar.)

17             THE COURT:  Go ahead, Ms. Noble.

18             MS. NOBLE:  Mr. Sidoti keeps indicating that Sergeant

19   Morefield indicated that he said confidential informant in a

20   report.  That's not accurate.  He indicated that -- that he was

21   allowed to omit that information from something that we call a

22   U-10, which is the arrest report, because it's an investigation

23   tactic.

24             THE COURT:  Are you talking about he said that when

25   Mr. Sidoti cross-examined him in the plaintiff's case in chief?

69

1    MS. NOBLE:  Yes, Your Honor.

2    THE COURT:  Okay.

3    MS. NOBLE:  And he keeps stating that Sergeant

4  Morefield used this confidential informant language.  And I

5  don't think that that's -- I think that's a mischaracterization

6  of the evidence.  I think somebody else may have done that.  I

7  don't believe Sergeant Morefield was the person that used that

8  term.

9    THE COURT:  Here's my position.  The jury heard the

10  testimony, and I'm going to trust the jury that they remember

11  it.

12    Mr. Sidoti, why is this not asked and answered?

13    MR. SIDOTI:  I'm done.  I'm going to finish up with

14  the last question and then I'm done.

15    THE COURT:  Good enough.

16    MS. NOBLE:  Thank you, Your Honor.

17   (The following proceeding was held in open court.)

18    THE COURT:  Please continue, Mr. Sidoti.

19  BY MR. SIDOTI:

20  Q.   Do you think transparency is important in this case?

21  A.   Absolutely.

22  Q.   Do you think that transparency is important for the

23  entire core and essence of this judicial system?

24  A.   Absolutely.

25  Q.   Anything else you mischaracterized in the last two weeks

70

1    that I haven't specifically brought up that you want to tell

2    them now?

3            MS. NOBLE:  Objection.

4            THE COURT:  Sustained.

5            MR. SIDOTI:  I have nothing further.

6            THE COURT:  Redirect, Ms. Noble.

7            MS. NOBLE:  Very briefly, Your Honor.

8                           -  -  -

9                    REDIRECT EXAMINATION

10   BY MS. NOBLE

11   Q.    Sergeant Morefield, have you truthfully disclosed your

12   use of Facebook in this incident?

13   A.    I have.

14   Q.    To this jury?

15   A.    To this jury, yes.

16   Q.    And Mr. Sidoti brought up uses of force that you,

17   Officer Johnson, and Officer Connair used.  Were these all at

18   the same time?

19   A.    They were not.

20           MS. NOBLE:  Nothing further, Your Honor.

21           THE COURT:  Thank you.  Any recross, Mr. Sidoti?

22           MR. SIDOTI:  No, sir.  Thank you.

23           THE COURT:  Sergeant Morefield, thank you.  You may be

24   excused.

25           Ms. Pickerill, your next witness.

71

```
1                              – – –

2                           *  *  *  *  *

3                              – – –

4                                    FRIDAY AFTERNOON SESSION

5                                    DECEMBER 17, 2021

6                              – – –

7                           *  *  *  *  *

8                              – – –

9          THE COURT:  Ms. Rosenberg, your next witness.

10         MS. ROSENBERG:  The defendant would call Officer

11   Reffitt.

12         THE COURT:  Officer Reffitt, please come forward.

13   You're still under oath.

14                              – – –

15                          ROBERT REFFITT

16     Called as a witness on behalf of the Defendant, being first

17   duly sworn, testified as follows:

18                          DIRECT EXAMINATION

19     BY MS. ROSENBERG:

20     Q.   Officer Reffitt, can you re-introduce yourself to the

21   jury?

22     A.   Officer Robert Reffitt.

23     Q.   How long have you been with the Columbus Police

24   Department?

25     A.   Eighteen years.
```

72

1    Q.   And did you have any prior employment to joining the

2  police force?

3    A.   No, no other police agencies.

4    Q.   Any other types of employment?

5    A.   Yeah.  I drove a tow truck for a while, dump truck, and

6  then I worked for the City of Columbus in their fleet

7  management department.

8    Q.   Why did you decide to go to the police academy?

9    A.   At the time I had two kids and was working about 80

10  hours a week, and it was a job I could get to cut that in half.

11    Q.   And you heard previous testimony about the six-month

12  Columbus Police Academy?

13    A.   Yes.

14    Q.   Did you also complete the same?

15    A.   Yes.

16    Q.   Did you also complete defensive tactics training during

17  the academy?

18    A.   Yes, we all did.

19    Q.   And are you also required to do that annual follow-up?

20    A.   Yes.  Every year we have a DTU class and also

21  in-service.

22    Q.   Besides that mandatory follow-up, are there other

23  elective defensive tactics courses you can take?

24    A.   You can if you sign up for it.  Usually a couple times a

25  year they will offer like a more advanced -- but like an

73

1    additional class if you wish to take it.

2    Q.   Okay.  Have you ever been a field training officer or

3    anything like that?

4    A.   Yeah.  I was a field training officer for a few years.

5    I did seven or eight recruits in training.  I also do a basic

6    OPOTA instructor through the state of Ohio which I will go to

7    the academy for drivers training because I have my drivers

8    instructor's certificate just for the recruits every class,

9    just for the driving instruction part.

10   Q.   How long have you done that?

11   A.   Five or six years now.

12   Q.   And what's your current assignment?

13   A.   I'm a detective in our felony assault unit.

14   Q.   How long have you been doing that?

15   A.   I went up there this last June.

16   Q.   Any more other special assignments that you want to tell

17   us about?

18   A.   I did some temporary assignments with the gang unit

19   mostly.  I'd go up two or three times a year, help them out

20   with that.  Just from working the same precinct when I was on

21   patrol pretty much my whole career, I got to know a lot of the

22   people.  Then as time goes on, everyone gets older, I ended up

23   dealing with their kids; so, you know.

24   Q.   Let's go right to September 1st, 2017.  Do you recall

25   where you were at just prior to going to the Livingston Market?

74

1    A.    Yes.  Myself and Officer Baker were up north off of 161,

2    Tamarack, area checking an address when we got a call on the

3    radio, I believe, from Officer Connair that they had contact

4    and wanted us to get south to the F&L Market.

5    Q.    Do you recall how long it took for you to get there?

6    A.    No, not offhand.  Not that long.  We were kind of

7    hurried a little bit.

8    Q.    And when you got there, what do you remember happening

9    when you went through the door?

10   A.    I knew that they had been there -- like I said, myself

11   and Officer Baker were at the traffic light a little east of

12   the store at Alum Creek and Livingston.  They had come on the

13   radio and said, Hey, we believe he's inside, we're going to go

14   in.  Officer Baker said, Hey, hold on, we're just up the

15   street.

16         And after that we had no more radio contact.  So I had

17   to wait for the light to turn green, then we made our way to

18   the store.  And then Officer Baker got out.  He was the

19   passenger.  He got out first.  I got out but then hesitated for

20   a second because I had to get the key fob for the car.  I

21   didn't want someone taking the car with all of our stuff in it.

22   That's when I made my way into the front door.

23   Q.    You've heard testimony about a 10-3 call.  Did you

24   arrive before or after that, do you know?

25   A.    I did not hear that call.  I don't know if that occurred

75

1    as I was getting out of the car, but I didn't recall hearing

2    it.

3      Q.   When you went inside, you weren't aware of that, to your

4    knowledge?

5      A.   No.  I assumed everybody was inside because their car

6    was parked out front.

7      Q.   So when you went inside, tell me what you were hearing

8    and seeing initially.

9      A.   Initially, when I first entered through the door, I

10   everybody in the aisle just kind of struggling.  I remember

11   seeing Officer Everhart look back at me, and I heard him say

12   get the taser.  And then, of course, we didn't have it because

13   we had just turned it in because it was getting close to the

14   end of our shift and we had to leave it for third shift

15   officers.

16       And then -- so then that's when I came up behind.

17   Mr. Davis was kind of on all fours with his rear in the air.

18   Officer Everhart was behind, and then I seen Officer Johnson

19   trying to get his left arm out, and then Officer Connair was on

20   the right side of him.  So at that point I knew that they were

21   obviously having trouble getting his arms out to get him

22   handcuffed.

23     Q.   What were you hearing?  Were you hearing anything that

24   you recall?

25     A.   A lot of yelling, some from Mr. Davis and then from the

1    officers, and then just everybody starting to give commands to

2    put your hands behind your back and all that stuff.  That's

3    when I started to attempt to get him to flatten out.

4        Q.    What did you do in order to do that?

5        A.    So I was trying to get my -- I took my right foot and I

6    pushed it on his lower backside trying to not only push down

7    but also push him forward to get him to flatten out, just to

8    get him proned out on the ground and not be up because he's

9    trying to -- can't really stand up from that point but he's

10   trying to raise up as if trying to get to his feet.

11       Q.    At that point did you see Mr. Davis in handcuffs at all?

12       A.    No.  I did not see the initial first handcuff that other

13   people had testified, that his right hand had got a handcuff on

14   it at some point.  We was just trying to knock him forward, and

15   that wasn't working.  So then at that point is when I delivered

16   the kick to his left inner femoral area of his leg to try to

17   jolt the leg to numb it or at least knock it out to where we

18   can get him prone and flat.  I figured at that point it would

19   be easier to get his hands out from underneath him.

20       Q.    And was that effective?

21       A.    No.

22       Q.    So what did you do after that?

23       A.    So after that I then -- believe I then with my left knee

24   on Mr. Davis's back, again with my foot still off of his rear,

25   I was again trying to then apply more of my body weight to push

77

1   him down, and also with my foot kind of over his rear to try

2   and push him forward, you know.  And then that also was -- that

3   wasn't working.

4   Q.   So after you did that, was Mr. Davis in handcuffs at

5   that point?

6   A.   No.

7   Q.   So what did you do next?

8   A.   At that point I then moved around to the left side of

9   Mr. Davis.  And then I know Officer Johnson was still trying to

10  get the left arm out.  So that's when I delivered -- but he

11  then -- back up a little bit.  At that point Mr. Davis had went

12  flat.  So Officer Johnson was trying to pull his left arm out

13  from underneath him.  I remember I had my -- I had my cuffs out

14  because I wasn't sure whose, what, or who had cuffs.

15       And he was still struggling trying to pull his arm out.

16  That's when I delivered three to five kicks to Mr. Davis's left

17  side trying to get him hopefully to bring his arm out to stop

18  the kicks or to protect himself on that side to where then just

19  leverage we could get his arm behind him and get him cuffed.

20  And that -- those kicks were ineffective.  They didn't work

21  because he never brought his hand out.  That was the end of my

22  force at that point because nothing was working.

23  Q.   When you noticed that wasn't effective, where did you

24  position yourself at that point?

25  A.   I was still on the left side.  And then eventually, I

78

1    believe, just once he reached the point of exhaustion, they

2    were finally able to get his hands out enough to where then the

3    one cuff was on his right arm.  So I was able to get a cuff on

4    his left arm and then link the two cuffs together.  So it was a

5    wider --

6    Q.    So you used your handcuffs?

7    A.    Yes.  They were a pair of my handcuffs.  And then I just

8    linked those to the cuff that were on his right hand.  So he

9    was double cuffed.

10   Q.    At what point do you recall any other uniform officers

11   arriving in that sequence?

12   A.    Before we finally got his hands out, they said -- now I

13   know it was Officer Bennett.  Before that I didn't know who it

14   was.  I knew the taser had been deployed.  With Mr. Davis's

15   actions and everything else, to me, it wasn't working.  I heard

16   the initial pop, and then I heard it going through its cycles.

17   But it wasn't effective.  It wasn't doing anything.  It wasn't

18   the usual behavior or -- it didn't seem to me that there was

19   any lockout like I'm used to seeing.

20   Q.    And have you used a taser before?

21   A.    Yes, I have.

22   Q.    So what were you expecting to be the result of using a

23   taser?

24   A.    I was expecting him to just pretty much lock out, you

25   know, get stiff.  And usually when that occurs, we're able to

79

1    just move the arms.  And then once it releases, then you get

2    that second of release that we can get everything there and get

3    him handcuffed.

4        Q.    And you didn't see that happening during the taser

5    cycle?

6        A.    No.

7        Q.    After you used your cuff to connect to the other cuff,

8    did you use any additional uses of force on Mr. Davis?

9        A.    No.

10       Q.    Did you see any additional uses of force?

11       A.    No.

12       Q.    How are you feeling after that happened, after the

13   handcuff?

14       A.    Relieved but also still kind of in a state of shock

15   because I never had anyone fight that long not giving up their

16   hands.  It was a -- it was very rare.  When you see it on

17   YouTube, in other cities, stuff like that, but just to have it

18   there, it wasn't normal.

19       Q.    Had you had prior interactions with other individuals

20   where they resisted arrest before?

21       A.    Yeah, we had plenty of resistings, but nothing to that

22   magnitude.

23            MS. ROSENBERG:  I don't have anything else, Your

24   Honor.

25            THE COURT:  Thank you, Ms. Rosenberg.

80

1      Mr. Sidoti, cross?

2          MR. SIDOTI:  Thank you, sir.  Just one moment, sir.

3          THE COURT:  All right.

4                          - - -

5                    RECROSS-EXAMINATION

6   BY MR. SIDOTI:

7   Q.   Officer, how are you?

8   A.   Good.  Thank you.

9   Q.   Is it sergeant now?

10  A.   No.

11  Q.   Just detective, correct?

12  A.   Still an officer.

13  Q.   So, Detective, I don't have much, but I want to ask you

14  something regarding the commute.  You and Officer Baker were in

15  a separate car from the other four officers that arrived at the

16  market, correct?

17  A.   Correct.

18  Q.   You recall Officer Baker's testimony this afternoon?

19  A.   Yes.

20  Q.   He indicated for the ladies and gentlemen of the jury

21  that he thought you guys were about 12 miles away.  Do you

22  recall that?

23  A.   Yes.

24  Q.   He was asked about the time frame and gave kind of a

25  jovial recitation to the jury about how we stopped at every

81

1  light, kind of a wink and a nod, to get there in quick time in

2  approximately 12 minutes. Do you recall that testimony?

3  A.   Yes.

4        MR. SIDOTI:  May I approach the witness for a moment,

5  Your Honor?

6        THE COURT:  Yes you may.

7  BY MR. SIDOTI:

8  Q.   I want to show you what's been previously marked as

9  Plaintiff's 162.

10       For the purposes of the record, Plaintiff's 162 is the

11  internal affairs memorandum by Sergeant Johnson.  Turn to Bates

12  stamp 231.  There is a highlighted green area that I've shown

13  to your counsel.  Can you look at that area for a moment, sir?

14  Just let me know when you're done.

15  A.   Okay.

16  Q.   Did you have the opportunity to review that, Officer

17  Reffitt?

18  A.   Yes.

19  Q.   I know we didn't look through the entire document.  Have

20  you reviewed this document before?

21  A.   No, I don't believe I have.

22  Q.   Has this information been privy to you in regards to the

23  internal affairs investigation that was done by Sergeant

24  Johnson?

25  A.   As far as whether it was provided?

82

1    Q.    Yeah.  Was the information provided to you?

2    A.    I believe, but I don't remember reading it because I

3    didn't agree with Sergeant Johnson's findings and --

4    Q.    Right.  So I want to talk about that for a moment.

5         I don't want to talk about the discipline that came and

6    went through the chain of command regarding you.  I want to

7    talk about just the information that you reviewed.  Did you

8    have an opportunity to review that?

9    A.    Yes.

10    Q.    Do you recall when you were investigated by either

11    Sergeant Johnson and/or Sergeant Van Dop that you, in fact,

12    told them this information, that you and Officer Baker arrived

13    in approximately five minutes which had elapsed from the last

14    radio communication?  Do you recall that?

15    A.    That's what it says.

16    Q.    Do you recall that being your recollection of the date

17    of the time in which you engaged Mr. Davis on September 1st?

18    A.    I remember it being some time from -- when we went from

19    where we were up north to where we got to Alum Creek and

20    Livingston.  That's when they said they were going in.  It was

21    from that point until we got to the store that there was no

22    more radio transmissions.  But from Alum Creek and Livingston

23    to the store wasn't five minutes.

24    Q.    I understand.  But even your testimony just a moment ago

25    on direct was, when asked by your counsel -- and I quote, we

83

1  were just up the street.  Do you recall that testimony just a

2  moment ago?

3   A.   No.  Which part?

4   Q.   When you were asked before coming to the market about

5  where you were just a moment ago on direct testimony, and I

6  quote --

7   A.   When I said up the street -- we were in the north end at

8  161 and Tamarack.  That's further than up the street.

9   Q.   When you gave your interview with Sergeant Johnson

10  and/or Sergeant Van Dop, do you believe that the information

11  you provided them was honest and accurate?

12   A.   Well, I'm just saying for what Sergeant Johnson wrote in

13  there, as he did in another part of the letter, was wrong

14  information.  So I'm wondering if he might have had something

15  confused when he put five minutes, because there's no way five

16  minutes you can go from 161 and Tamarack to Alum Creek and

17  Livingston.

18   Q.   Let's talk about a mistake in information then.

19       MR. SIDOTI:  Could I have access for just Counsel and

20  the witness, Your Honor?

21       THE COURT:  Yes, you may.

22   BY MR. SIDOTI:

23   Q.   I'm going to show you in just a moment your use-of-force

24  report, if I can.  154.

25       MR. SIDOTI:  May I show this document to the witness?

84

1          THE COURT:  Yes, you may.

2      BY MR. SIDOTI:

3      Q.   Officer, while this is getting set up, we had some

4      colloquy, some questions back and forth regarding a

5      use-of-force report regarding Mr. Davis and then briefly

6      inquired about a worker's comp claim.

7          MS. ROSENBERG:  Objection.  Outside the scope.

8          THE COURT:  I'm going to allow Mr. Sidoti to finish

9      his question, then you may reimpose your objection.

10         Officer, wait until the question is asked.  Your lawyer

11     may have an objection.  So I'm asking you not to answer

12     immediately.  All right?

13         THE WITNESS:  Yes, Judge.

14     BY MR. SIDOTI:

15     Q.   Officer Reffitt, do you recall previously some questions

16     that were asked regarding the conduct allegedly of Mr. Davis

17     and a workers' comp claim that you made with the department?

18     Do you recall that?

19         MS. ROSENBERG:  Objection.  Outside the scope.

20         THE COURT:  Overruled.  You may answer.

21         THE WITNESS:  Yes.

22     BY MR. SIDOTI:

23     Q.   When it comes to the workers' comp claim, you have an

24     obligation to fill out documents referencing how you think the

25     injury was caused to see if it's something that's covered

85

1   perhaps by the department or not, correct?

2   A.   Correct.

3   Q.   Do you think it's important to be honest and forthright

4   regarding that, to see if it's a claim that's potentially

5   covered by the department or not?

6   A.   Yes.

7   Q.   For example, if you go and hurt yourself while you're

8   home gardening, that's not something that's going to go to your

9   workers' comp, correct?

10  A.   Correct.

11  Q.   I can show you, if you don't remember -- do you remember

12  when we discussed your use-of-force report, do you remember you

13  sustained an injury because Mr. Davis kicked you?  Do you

14  recall that?

15  A.   In my 128, yes.

16  Q.   That's not correct, though, is it?

17  A.   No.  At the time when I filled that out was right after

18  the incident.  And I sustained the injury during the

19  confrontation.  And since I was dealing with Mr. Davis pretty

20  much from his waist down, I did put in there that I just

21  assumed that during that whole scuffle that I had been kicked.

22  Q.   Officer Reffitt, but you filled out the workers' comp

23  form with your department on the exact same day, did you not?

24  A.   The same day as the 28th?

25  Q.   Yes.

1    A.    Yes.  We're required to fill out an injury packet.

2    Q.    So the same day you told this jury that you wrote that

3    down but you weren't sure because it was tumultuous or chaotic,

4    but you say in your 128:  I was injured because Mr. Davis

5    kicked me.  But then told this jury you were confused.  But you

6    admit that the workers' comp form for the injury was filled out

7    on the exact same day, correct?

8    A.    Which they would match.

9    Q.    Okay.  May I have this.  It's not working.

10        Can you see that on the screen there, sir?

11   A.    Yes.

12             THE COURT:  Just a second.

13        Ms. Rosenberg?

14             MS. ROSENBERG:  Your Honor, can we have a sidebar,

15   please?

16             THE COURT:  Yes.

17                          - - -

18      (The following proceeding was held at sidebar.)

19             THE COURT:  Go ahead, Ms. Rosenberg.

20             MS. ROSENBERG:  Your Honor, we received a subpoena

21   during trial yesterday regarding the BWC records that

22   Mr. Sidoti is about to reference.  We got those records

23   sometime today, and I provided those records to Ms. Gelsomino.

24   I indicated that I would like to discuss these records with the

25   Court prior to using them because I had not got a chance to

87

1    redact nor actually review the records.

2              THE COURT:  Okay.

3              MS. ROSENBERG:  So I don't think it's proper to be

4    using these for impeachment when I already told them I didn't

5    have time to look at these documents.

6              THE COURT:  You have a right under the rules to see

7    this impeaching document.  But Mr. Sidoti, are you going to

8    use -- I'm assuming that the document says that he injured his

9    leg somewhere else?

10             MS. PICKERILL:  It actually says both, Your Honor.

11             THE COURT:  All right.  How long is the document?

12             MR. SIDOTI:  This is the only thing I'm going to show

13   him -- the document is 21 pages -- the actual form he filled

14   out with the department for the accident report on that day.

15   That's it.

16             MS. PICKERILL:  He also filled out this one on 9-1.

17             MR. SIDOTI:  That's the reinjury.  That's when he was

18   kicked.  That's this one, but this is him going back.

19             MS. PICKERILL:  Date reported 9-1-17.

20             THE COURT:  Hold up.

21         It's going to take you about -- I mean, if you think

22   that you need to take a recess to look at all 21 pages, that

23   would strain the Court's credulity.  If you need to take a

24   brief recess to look at the pages he's going to impeach, I can

25   understand that.  And if you need to -- well, he's on

88

1  cross-examination.  So you can't talk to your witness.  Do you

2  expect that there's something else in the 21 pages that has

3  anything to do with this impeachment?

4          MS. ROSENBERG:  Your Honor, I'm just --

5          THE COURT:  This document is not coming in as

6  substantive evidence.  It's just coming in for impeachment.

7  It's like any other impeaching document.  So you have a right

8  to see it.  But what I'm asking you, as a practical matter --

9  it's 4:30.  We're trying to get this case completed -- just a

10  second.  I want everybody's attention focused.  So we're trying

11  to get this case completed with some dispatch.  You tell me how

12  much time you're going to need to review these documents

13  because I'm going to let him use the document for impeachment

14  purposes.  It's not coming in as substantive evidence.  You

15  tell me, Ms. Rosenberg, how much time you need.

16          MS. ROSENBERG:  I would say ten minutes, Your Honor.

17  I just --

18          THE COURT:  Ten minutes is fine.

19          MR. SIDOTI:  That will be my last question.

20          THE COURT:  Ms. Rosenberg, ten minutes is fine.  Take

21  your ten minutes.

22      (The following proceeding was held in open court.)

23          THE COURT:  Ladies and gentlemen, we're going to take

24  a ten-minute recess.  Counsel has to review a document.  I'm

25  going to let you go back so you can stretch in the comfort of

89

1    your own room.  And we will resume at 4:40.

2        (Recess taken from 4:30 p.m. to 4:40 p.m.)

3        (Jury in at 4:40 p.m.)

4            THE COURT:  Please proceed, Mr. Sidoti.

5            MR. SIDOTI:  Ms. Evans, would you read back the last

6    question and answer, please.

7        (Thereupon, the last question and answer was read by the

8    court reporter.)

9      BY MR. SIDOTI:

10     Q.   You see on your screen there, Officer Reffitt -- I'm

11   going to go to the top for this.  Tell me after you've had a

12   moment to review that document, please.

13     A.   Yes.

14     Q.   Before I ask you any other questions, how much time do

15   you recall between the time you filled out your U-128 form and

16   between the time that you filled out this document for a

17   workers' comp claim?

18     A.   That I don't know.

19     Q.   The same evening?

20     A.   I'm not sure.

21     Q.   Let's go back for a moment to September 1st, 2017.

22   Mr. Davis was arrested at approximately ten o'clock at night,

23   correct?

24     A.   Yes.

25     Q.   Where did you go after Mr. Davis was taken in the paddy

1  wagon with Officers Johnson and Connair?

2  A.   I believe I went back to the sub, 12 sub.

3  Q.   That would have been the place which you would have

4  filled out your U-128 and potentially your workers' comp form,

5  correct?

6  A.   More than likely.

7  Q.   Do you recall what time you left there that evening?

8  A.   I do not.

9  Q.   What's your shift, as you recall it today, back with the

10  working group or with the department overall on that particular

11  day, if you remember?

12  A.   I don't recall because we had varied hours.  But I

13  believe on that day it might have been 3P to 11P.

14  Q.   If you don't recall the exact time frame, you just had

15  an opportunity to review a document regarding your workers'

16  comp claim, correct?

17  A.   Yes.

18  Q.   And the question before you looked at that document that

19  I posed related to the information in your U-128 and to compare

20  it to what you recall putting into your workers' comp form.  Do

21  you recall that?

22  A.   I'm sorry.  What were you asking me?

23  Q.   On the U-128, you said that Mr. Davis kicked you, right?

24  A.   Correct.

25  Q.   And then you just told this jury -- and my last question

1  was they should say the same thing or along those lines.  Do

2  you recall that?

3          MS. ROSENBERG:  Objection.

4          THE COURT:  Basis?

5          MS. ROSENBERG:  I would ask that the witness be shown

6  this entire document so he can see what date he completed it.

7  He wasn't able to see everything.

8          THE COURT:  When you say "the entire document," to

9  what are you referring, Ms. Rosenberg?

10          MS. ROSENBERG:  Your Honor --

11          THE COURT:  You're talking about the entire 21-page

12  document?

13          MS. ROSENBERG:  No.  The form that he completed on the

14  date in question.

15          THE COURT:  Do you have a copy of the form,

16  Mr. Sidoti?

17          MR. SIDOTI:  Your Honor, it was provided to me less

18  than an hour ago from the defense.

19          THE COURT:  Is this the document that's on the screen

20  now?

21          MS. ROSENBERG:  It's not every page, Your Honor.  I'm

22  sorry.

23          THE COURT:  Is there a way that we can scroll through

24  the pages so that the officer can see it?

25          MR. SIDOTI:  Yes, sir.

1          THE COURT:  Let's do that.  But could you -- could we

2     focus on the part about which he's being questioned?  And he

3     can certainly look at the entire document, Ms. Rosenberg,

4     before he answers the question.  You wanted to make sure he had

5     context; is that right?

6          MS. ROSENBERG:  Yes, Your Honor.

7          THE COURT:  But it's a document that he's completed;

8     is that right?

9          MS. ROSENBERG:  Yes, Your Honor.  But he's being asked

10    about the date he completed it.  I want him to see the date.

11         THE COURT:  Absolutely.  So let's get to the page that

12    would reflect the date so that the officer can see it.

13         MR. SIDOTI:  The defense would like to redact the

14    document prior to tendering it to us, Judge.  I don't know how

15    long that's going to take.

16         THE COURT:  You're going to show the document to the

17    officer now, and you're going to show him the page that has the

18    date on it.  And that's going to be done now.

19         MR. SIDOTI:  Judge, I have it ready.  I can scroll

20    through the entire indictment.

21         THE COURT:  I want him to see the page that has the

22    date on it.

23    BY MR. SIDOTI:

24    Q.  Can you see the document, Officer?

25    A.  Yes.

93

1    Q.   I'm going to scroll through.

2          THE COURT:  Have we gotten to the page that has the

3    date on it yet, Ms. Rosenberg?

4          MS. ROSENBERG:  Yes, Your Honor.

5          THE COURT:  We have?

6          MS. ROSENBERG:  It's on the screen now, Your Honor.

7          THE COURT:  Okay.  Do you see that, Officer?

8          THE WITNESS:  Yes, I do.

9          THE COURT:  And is that your signature on that?

10         THE WITNESS:  If you go up a little bit.  Yeah, it

11   looked like I signed it on 9-2.  So apparently this form was --

12         THE COURT:  Good enough.  Is there any more that you

13   wish your witness to see, Ms. Rosenberg?  Is there anything

14   else you want to direct his attention to?

15         MS. ROSENBERG:  No, Your Honor.  Thank you.

16         MS. NOBLE:  Please continue with your examination,

17   Mr. Sidoti.

18    BY MR. SIDOTI:

19    Q.   If I may, Officer, set this up again.  And I want to get

20   through it quickly.  Your U-128 form was filled out the same

21   evening or maybe after midnight that you had interaction with

22   Mr. Davis, correct?

23    A.   Yes.

24    Q.   In that U-128 form, you told sergeants through that

25   form, Van Dop and Johnson, that Mr. Davis kicked you, correct?

94

1   A.   Yes.

2   Q.   And then we talked about how it's chaotic or whatever it

3   may have been.  Then I asked you about workers' comp in which

4   you indicated that you executed the documents perhaps the same

5   evening that you executed your U-128, correct?

6   A.   Yes.  And after looking at it at the bottom of this one

7   when I signed it, it looks like it was the next day.

8   Q.   Mr. Davis was arrested around ten, maybe 10:30, correct?

9   A.   Correct.

10  Q.   Do you remember staying at the station after midnight

11  that evening?

12  A.   I don't recall.

13  Q.   But for the sake of 9-1 to 9-2, a time frame, whether

14  it's 11:30 to 12:05, you don't have that information or

15  recollection for this jury, do you?

16  A.   No, I don't.

17  Q.   And my question to you was, although you were confused

18  about Mr. Davis kicking you, what did you put on the form for

19  workers' comp?  Do you recall that questioning?

20  A.   Yes.

21  Q.   And you indicated to the jury it would have said the

22  same thing, right?

23  A.   I assumed.  But looking at this, obviously it does not.

24  Q.   Right.  This says nothing about Mr. Davis kicking you in

25  the form you completed to have workers' compensation as a

95

1    result of your interaction with him on September 1st, 2017,

2    correct?

3    A.   Correct.  Because due to the confrontation was the

4    injury.  It didn't change much.

5    Q.   I just want you to look at the line that starts with

6    describe how accident occurred.  Do you see that?

7    A.   Yes, sir.

8    Q.   Fighting with a wanted felon on a hard floor covered in

9    Faygo pop and cotton candy.  Leg inserted, knee twisted, or

10   slipped in pop and toe hurts from kicks applied to subject.

11        Does that accurately depict the information you wrote in

12   your workers' comp form the night you engaged with Mr. Davis?

13   A.   Yes.

14   Q.   That's not the same as Mr. Davis kicking you, is it,

15   sir?

16   A.   No.

17   Q.   You told this jury that you couldn't even remember what

18   occurred because it was so chaotic, that you couldn't even

19   remember information when you're dead sober, not under the

20   influence of drugs, to remember that you weren't kicked in the

21   knee but hurt it slipping in pop, right, that's what you told

22   them?

23   A.   Because at the initial time during the confrontation,

24   everything was chaotic.  That's when I filled that out.  I

25   dealt with Mr. Davis pretty much from his waist down.  With

96

1   everything going on, it was just, you know -- but Mr. Davis

2   wasn't charged with it, nor was I looking to file charges for

3   it.  It was just it got injured during a confrontation.  And at

4   the time I thought I had been kicked.

5       Q.   Kicking an officer is a felony, isn't it?

6       A.   Hence, there was no charges filed because I didn't know,

7   nor was trying to file charges for the assault because I didn't

8   know.

9       Q.   Officer, you told this jury that it was so chaotic for

10  your involvement, you couldn't remember after you left the

11  scene, drove to the department to fill out government documents

12  that it just maybe slipped your mind.  But you expect this jury

13  to believe that Mr. Davis was kicked and punched and brutalized

14  for minutes in the face and in the head that you expect him to

15  abide by a command in less than half a second?

16      A.   To give up his hands?

17      Q.   Yes.

18      A.   Yeah.  It's not that hard.

19           MR. SIDOTI:  Nothing further.

20           THE COURT:  Ms. Rosenberg, any redirect?

21           MS. ROSENBERG:  Just briefly, Your Honor.

22           THE COURT:  Please.

23

24

25

97

1                              - - -

2                      REDIRECT EXAMINATION

3       BY MS. ROSENBERG:

4       Q.    Officer Reffitt, when you testified in court last

5   Friday -- don't quote me on that -- you didn't indicate that

6   you were injured as a result of Mr. Davis, did you?

7             THE COURT:  Just a second.  Do you want to rephrase

8   your question?

9       BY MS. ROSENBERG:

10      Q.    What was your testimony regarding how you were injured?

11      A.    I don't recall exactly what I said, but just said it was

12  during the confrontation.

13      Q.    Did you indicate that Mr. Davis kicked you?

14      A.    In my 128, yes.

15      Q.    When you testified, is that what you indicated before

16  you had time to reflect?

17      A.    No.  I said just with everything going on, that's why I

18  put that, but...

19      Q.    Is the U-128 form that you completed directly after the

20  incident the only form that you indicated that information in?

21      A.    Yes.

22      Q.    And after subsequent any documents you completed, you

23  have consistently indicated how your injury occurred?

24      A.    Just with -- I mean, with workers' comp or which?

25      Q.    With workers' comp in this courtroom.

98

1    A.    That would be the only forms about it.

2          MS. ROSENBERG:  Nothing further.

3          THE COURT:  Do you have anything?  I thought you were

4    conferring with --

5          MS. ROSENBERG:  I'm done.

6          THE COURT:  Do you have any recross?

7          MR. SIDOTI:  Just one moment, please.

8                          - - -

9                    RECROSS-EXAMINATION

10   BY MR. SIDOTI:

11   Q.    Your counsel asked you a question that but for your

12   U-128 form, you never told anyone or filled out any other forms

13   that said Mr. Davis kicked.  You do you recall that question a

14   moment ago?

15   A.    Yes.

16   Q.    And you indicated you had not, correct?

17   A.    Not that I'm aware of or recall.

18         MR. SIDOTI:  Your Honor, may I approach the witness

19   for a moment?

20         THE COURT:  Yes.

21   BY MR. SIDOTI:

22   Q.    Sir, I'm going to show you what's been marked as

23   Plaintiff's Exhibit 161.  That's the interdivisional report the

24   jury has heard about from the excessive force involving both

25   Van Dop and Sergeant Johnson.  If you look at the bottom of

99

1    that page, please, regarding your interview.

2    A.    Okay.

3    Q.    Have you had the opportunity to review that document?

4    A.    I have.

5    Q.    What's the date up top, sir, that indicates the day that

6    you interviewed with Sergeant Van Dop?

7    A.    September 13th.

8    Q.    And how many days is this removed from the day you

9    filled out your document both for workers' comp and alleging

10   that Mr. Davis kicked you from the U-128 form?

11   A.    Probably about ten.

12   Q.    Ten or 12 days later, right?

13   A.    Yes.

14   Q.    What do you say to Officer Van Dop?

15   A.    On the underlined part?

16   Q.    Yes.  Let me set this up, please, for a moment.  You had

17   an audio -- you had a verbal conversation.  You met with

18   Sergeant Van Dop to talk about your use of force in the

19   interaction regarding Mr. Davis; is that correct?

20   A.    Yes.

21   Q.    Both with Sergeant Van Dop and then a recorded statement

22   with Sergeant Johnson, correct?

23   A.    Correct.

24   Q.    Who is the IAB supervisor at that time, correct?

25   A.    Correct.

100

1    Q.   And at the bottom of this document in regards to Van

2   Dop's memo that gets exchanged throughout the department,

3   including potentially the chief of police, indicates he spoke

4   to you and that you told him that one of Mr. Davis's kicks

5   struck you in the knee.  Is that what's reflected in Sergeant

6   Van Dop's report?

7    A.   That's what it says.

8    Q.   Twelve days later from when you said it was so chaotic

9   that you remember enough for your workers' comp but not 12 days

10   later with your supervising officer to tell him that it was not

11   a kick, that I may have slipped, correct?

12    A.   Correct.  It's in there.

13         MR. SIDOTI:  I have nothing further.

14         THE COURT:  I trust that you have nothing further,

15   Ms. Rosenberg, or do you?

16         MS. ROSENBERG:  No, Your Honor.

17         THE COURT:  Officer, you may step down, sir.

18      It's five minutes till five, ladies and gentlemen.  I

19   don't believe we have any witnesses that we can get done in the

20   next five or ten minutes, and so we will be done for the day.

21   I think that we have -- before I excuse you, Counsel.

22      (Thereupon, Court and Counsel conferred out of the hearing

23   of open court and off the record.)

24         THE COURT:  Ladies and gentlemen, I've spoken with

25   counsel.  We believe that with the remaining -- with the number

101

1   of witnesses who remain, that number is five, that you should

2   get the case for your deliberations on Tuesday.

3        And I'm telling you that for planning purposes.  There

4   is no circumstance, none, under which you will be either

5   hearing testimony -- I can't say there's no circumstance which

6   you will be deliberating on the 24th, but you certainly won't

7   be hearing testimony on the 24th.  And the only way that you

8   will be deliberating on the 24th is that if you decide you want

9   to deliberate on the 24th.  Otherwise, if we go to the 24th, we

10  will come back that Monday after Christmas.

11       So I don't want anybody to think, well, the last items

12  that I didn't get this weekend that I need to get on Christmas

13  Eve or preparing for family and friends to come over, I don't

14  want anybody to be distracted thinking on that because we're

15  not going to have you come in to continue to deliberate on the

16  24th unless you decide you want to do so.  And certainly

17  there's no way we'll be taking any testimony on the 24th.  I'm

18  pretty certain we'll be done by Tuesday.

19       So thank you very much, ladies and gentlemen, for your

20  patience.  I know at times we were tested because at times mine

21  was tested.  Have a good weekend.  Have a good trip home.  The

22  weather is kind of mild so you might have a chance to get

23  outside, get some fresh air.  Be safe and be careful, and I

24  look forward to seeing everyone on Monday.  Thank you.

25       (Jury out at 5:01 p.m.)

102

1          THE COURT:  Ms. Noble, are there any other matters

2    that we need to take up from the defense this afternoon?

3          MS. NOBLE:  Your Honor, defense would like to offer a

4    proffer regarding Baker and -- Officer Baker and Detective

5    Reffitt.  I'm asking for permission to do that on Monday.

6          THE COURT:  All right.  That's fine.

7          MS. NOBLE:  Thank you very much.

8          THE COURT:  Is there anything else from the defense?

9          MS. NOBLE:  That's everything, Your Honor.  Thank you

10   very much.

11         THE COURT:  Mr. Sidoti, anything from the plaintiff

12   before we break camp?

13         MR. SIDOTI:  Judge, I was ordered to return to you the

14   unredacted document from Plaintiff's Exhibit 180, and I have

15   that for you.

16         THE COURT:  All right.  Thank you.  You can give it to

17   Ms. Clark.  Is there anything else?

18       The only other thing I would ask is that one

19   representative of the plaintiff, one of the defense, meet with

20   Ms. Clark now and make sure that we cover all of the exhibits

21   from today.

22         MS. PICKERILL:  Yes, Your Honor.

23         THE COURT:  If not, everybody, have a great weekend.

24   Be safe and take care.  I look forward to seeing everybody

25   at 8:30 on Monday morning.  Take care.

1       (Proceedings concluded at 5:03 p.m.)

2                              – – –

104

1                    C E R T I F I C A T E

2

3          I, Shawna J. Evans, do hereby certify that the

4    foregoing is a true and correct transcript of the proceedings,

5    including the testimony of LeVon Morefield and Robert Reffitt

6    only, before the Honorable Algenon L. Marbley, Judge, in the

7    United States District Court, Southern District of Ohio,

8    Eastern Division, on the date indicated, reported by me in

9    shorthand and transcribed by me or under my supervision.

10

11

12                              s/Shawna J. Evans_____
                                Shawna J. Evans, RMR, CRR
13                              Official Federal Court Reporter

14

15                              January 16, 2022

16

17

18

19

20

21

22

23

24

25