**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **TIMOTHY DAVIS,** | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2:17-cv-0823** |
| | : | |
| **v.** | : | **Chief Judge Algenon L. Marbley** |
| | : | |
| **CITY OF COLUMBUS, OHIO,** *et al.*, | : | **Magistrate Judge Chelsey M. Vascura** |
| | : | |
| **Defendants.** | : | |

**OPINION & ORDER**

This matter is before the Court on Plaintiff's Motion for a New Trial (ECF No. 129). For the reasons that follow, Plaintiff's Motion is **GRANTED IN PART** and **DENIED IN PART.** Plaintiff is entitled to a limited retrial under Fed. R. Civ. P. 59(a), as detailed herein.

## I.   BACKGROUND

The facts underlying this case are set forth in the Court's Opinion & Order of September 27, 2021 (ECF No. 91), denying Defendants' Motion for Summary Judgment. Briefly, this is a civil rights action brought under the Fourth Amendment and 42 U.S.C. § 1983 against the City of Columbus and eight Officers of the Columbus Division of Police ("CPD"): Defendants Matthew Baker, Alan Bennett, Sean Connair, Eric Everhart, Anthony Johnson, LeVon Morefield, Robert Reffitt, and Ryan Steele. Plaintiff Timothy Davis alleges these Officers used excessive and unconstitutional force in effecting his arrest on outstanding warrants, and that the City is liable for the same.

A jury trial commenced on December 6, 2021. Plaintiff called each of the eight Defendant Officers, bystander Michael Woodson-Levey, treating physician Dr. Brian Mussio, Commander Robert Meader, Lieutenant Edward Hasson, former Chief of Police Kimberley Jacobs, Deputy

Chief Richard Bash, Internal Affairs investigator Sergeant Joseph Johnson, and expert Dr. Roy Taylor. Plaintiff was the last to testify during his case in chief. At the close of Plaintiff's case, Defendants moved for judgment as a matter of law, which the Court denied. During Defendants' case, they called each of the eight Defendant Officers, Chief Jacobs, Commander Nicholas Konves, Deputy Chief Bash, and expert Officer Patrick Vehr. Defendants renewed their motion for judgment as a matter of law, which the Court again denied.

After ten days of testimony, the jury was charged on December 21, 2021. The jury deliberated and, the next day, returned a verdict for Defendants on all counts. (ECF No. 119). The Court entered judgment accordingly. (ECF No. 120).

On January 19, 2022, Plaintiff filed his Motion for a New Trial, in which he argued the verdict was against the clear weight of the evidence. (ECF No. 129 at 3–9). As other grounds for relief, Plaintiff also identified prejudicial occurrences relating to racial stereotyping, expert testimony, and juror conduct. (*Id.* at 9–17). Following full briefing (ECF Nos. 134 & 138), the Motion stands ripe for adjudication.

## II.   LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 59(a)(1)(A), "[t]he court may, on motion, grant a new trial on all or some of the issues—and to any party—as follows: after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Determining whether a new trial is appropriate is within the discretion of the trial court. *See Acuity Mut. Ins. Co. v. Frye*, 471 F. App'x 431, 435 (6th Cir. 2012) (internal citation omitted).

Generally, a court "should grant a motion for new trial only when a jury has reached a seriously erroneous result as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." *Mitchell v. Boelcke*, 440 F.3d 300, 303

2

(6th Cir. 2006) (internal quotation marks omitted) (citing *Holmes v. Massillon*, 78 F.3d 1041, 1045–46 (6th Cir. 1996)). "When ruling on a new trial motion claiming that the verdict was against the weight of the evidence, the district court 'may compare the opposing proofs and weigh the evidence.'" *Conte v. Gen. Housewares Corp.*, 215 F.3d 628, 637 (6th Cir. 2000) (quoting *Toth v. Yoder Co.*, 749 F.2d 1190, 1197 (6th Cir. 1984)).

The court may not "set aside the verdict simply because it believes that another outcome is more justified." *Denhof v. City of Grand Rapids*, 494 F.3d 534, 543 (6th Cir. 2007). "The court is to accept the jury's verdict 'if it is one which reasonably could have been reached.'" *Id.* (quoting *Duncan v. Duncan*, 377 F.2d 49, 52 (6th Cir. 1967)). However, "where an injustice will otherwise result, the trial judge has the duty as well as the power to order a new trial." *Davis v. Jellico Cmty. Hosp. Inc.*, 912 F.2d 129, 133 (6th Cir. 1990) (internal quotation marks omitted).

### III.   LAW & ANALYSIS

Before delving into the substance of Plaintiff's Motion, some clarity is due on the scope of relief available. Despite the Motion's caption, Plaintiff seeks a new trial in the alternative; his primary request is that the Court "alter or amend the judgment," pursuant to Fed. R. Civ. P. 59(e), to prevent "manifest injustice." (ECF No. 129 at 1–2). The supporting arguments merge, with Plaintiff contending that the jury's verdict was manifestly unjust in light of the evidence adduced at trial.

Plaintiff does not state whether he intends for the Court merely to set aside the judgment as part of a new trial order, or to reverse the jury's verdict and enter judgment in his favor. If Plaintiff intends the latter, his Motion is functionally one for judgment as a matter of law. Plaintiff did not make such a motion at trial, so he is precluded from bringing one now. *See Hanover Am. Ins. Co. v. Tattooed Millionaire Ent., LLC*, 974 F.3d 767, 770–71 (6th Cir. 2020) (holding it is

"impermissible" for a party to "make a Rule 50(b) motion if it has not previously made a Rule 50(a) motion"). A Rule 59(e) motion is no substitute; it "may not be granted where to do so would undermine the jury's fact-finding role and trample on the defendant's seventh amendment right to a jury trial." *Robinson v. Watts Detective Agency, Inc.*, 685 F.2d 729, 742 (1st Cir. 1982); *see also* 11 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2810.1 (3d ed.).[1] Rule 59(e) also "'may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment.'" *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008).

The proper vehicle for Plaintiff's arguments is a Rule 59(a) motion for a new trial. Naturally, a new trial may mean abrogating the original jury verdict and judgment entry; but that is the most Plaintiff can obtain under Rule 59(a). A judgment for Plaintiff cannot occur without a second trial. As such, Plaintiff's Motion will be analyzed under the standards applicable to a new trial motion, rather than a motion to alter or amend judgment.

## A. Weight of the Evidence

Plaintiff's first argument for a new trial is that "the jury's verdict was seriously erroneous and against the clear weight of the evidence presented at trial." (ECF No. 129 at 3). Based on that evidence, Plaintiff states, "no reasonable jury could find that each and every one of the dozens of uses of force against Timothy Davis was justified." (*Id.*).

The jury received the following instruction on excessive force:

<u>NO. 22: EXCESSIVE FORCE</u>

Plaintiff claims that Defendant Police Officers used excessive force when they arrested Plaintiff. In making a lawful arrest, a law enforcement officer has the right to use such force as is necessary under the circumstances to effect the arrest.

---

[1] *But see Abrahamsen v. Trans-State Express, Inc.*, 92 F.3d 425, 429 (6th Cir. 1996) (relief from judgment under Rule 60(b) was warranted where "new evidence" rendered the jury's finding "unreasonable").

Whether or not the force used in making an arrest was unreasonable is a question to be determined by you in light of all of the evidence received in the case.

You must determine the degree of force that a reasonable and prudent police officer would have applied in effecting the arrest under the circumstances shown from the evidence received in this case. In determining whether Defendant Police Officers used excessive force, you may consider:
>    1) The extent of the injury suffered,
>    2) The need for the application of force,
>    3) The relationship between the need and the amount of force used,
>    4) The threat reasonably perceived by the responsible officials, and
>    5) Any efforts made to temper the severity of a forceful response.

You must consider each stage of the incident between Defendant Police Officers and Plaintiff independently. An excessive use of force may be present at one point during the arrest but not present at other points.

The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with hindsight. The nature of reasonableness must allow for the fact that police officers are often forced to make split-second judgments—under circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

This reasonableness inquiry is an objective one. The question is whether Defendant Police Officers' actions were objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.

(Jury Instruction No. 22, adapted from 3B Fed. Jury Prac. & Instr. § 165.23 (6th ed.); *see* ECF No. 149, Tr. 116:14–117:21).

In accordance with this instruction, the Court will consider Plaintiff's arrest in stages. *See also Gaddis v. Redford Twp.*, 364 F.3d 763, 772 (6th Cir. 2004) ("In this circuit, courts faced with an excessive force case that involves several uses of force must generally 'analyze the . . . claims separately.'" (quoting *Dickerson v. McClellan*, 101 F.3d 1151, 1162 (6th Cir. 1996))). The Court will "apply an objective standard, looking to 'the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect pose[d] an immediate threat to the safety of the officers or others, and [3] whether he was actively resisting arrest or attempting

5

to evade arrest by flight.'" *Id.* (alterations original) (quoting *Russo v. City of Cincinnati*, 953 F.2d 1036, 1044 (6th Cir. 1992); and *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

### 1. Initial Encounter

The initial portion of the arrest—when Officers Johnson, Morefield, Everhart, and Connair first entered the Livingston Market—is not captured on video. The debate at trial centered on whether Officers ever informed Plaintiff he was under arrest. Officer Johnson, who was first into the market, testified that he did announce himself—"something to the effect" of "Columbus police, you're under arrest for your warrants, man." (ECF No. 141, Tr. 165:17–167:10). Per Officer Johnson's testimony, Plaintiff replied "No, I'm not," then "began to push and pull [Officer Johnson] against the door." (*Id.*, Tr. 167:13–168:3). Officer Johnson also testified—and later-taken video footage corroborated—that he was wearing a badge and a tactical vest with "POLICE" in prominent lettering. (*See id.*, Tr. 168:15–169:5). Sergeant Morefield,[2] who was covering Officer Johnson, testified that he witnessed Plaintiff's resistance and, in response, struck Plaintiff twice in the face and once in the rib, intending "to discombobulate him temporarily" so Officers could "take control of him." (ECF No. 147, Tr. 36:21–38:23).

Plaintiff claimed he was punched in the face without warning, and that he never realized the Officers were policemen. (*See* ECF No. 145, Tr. 113:20–115:8). Michael Woodson-Levey, a bystander who recorded cell phone video of the later stages of the arrest, testified that he also did not hear the Officers announce themselves. All he heard was "N-word, don't move." Mr. Woodson-Levey initially thought "someone was possibly getting robbed." (*See* ECF No. 140, Tr. 69:7–70:21).

---

[2] Sergeant Morefield held the rank of Officer at the time of Plaintiff's arrest. He recently was elevated to Sergeant. (*See* ECF No. 139, Tr. 53:13–54:4).

Given the absence of objectively verifiable evidence, the jury reasonably could have accepted Defendants' version of the initial encounter. The Court acknowledged as much when it denied Defendants' renewed motion for judgment as a matter of law. (*See* ECF No. 148, Tr. 220:19–221:9).[3] For the Court to set aside this portion of the verdict, it would have to make credibility determinations as between Plaintiff and Mr. Woodson-Levey, on the one hand, and Defendant Officers on the other. "[C]redibility determinations are within the sole province of the jury" and are owed "special deference" by the Court. *United States v. Miller*, 562 F. App'x 272, 295 (6th Cir. 2014) (citing *United States v. Latouf*, 132 F.3d 320, 330–31 (6th Cir. 1997)). With respect to these first uses of force, the verdict must stand.

### 2. Middle Stage

Shortly after Defendants' initial uses of force, Mr. Woodson-Levey began recording the arrest. Mr. Woodson-Levey first captured a short, four-second clip (admitted as Joint Exhibit 4) of

---

[3] Defendants cite the Court's oral ruling for a much broader acknowledgement, "that a reasonable jury could find in favor of the Plaintiff or the Defendants." (ECF No. 134 at 3). Context, however, is key. The full passage reads:

> The case is reasonably simple to me. If the jury believes the police officers, then there was a reasonable use of force. The jury would have to believe that what we can't see is what we should believe. *That is, we don't see the initial encounter,* the police officers announcing their office, Mr. Davis reacting to Officer Johnson, pushing him, pushing the other officers out of the way. And if they believe that testimony -- which they very well could because the tape shows that the police had vests on that said police; so maybe Mr. Davis knew that they were police.

(*Id.* (emphasis added)). All the evidence discussed in this passage relates to "the initial encounter." The Court did not rule, much less intimate, that if the jury credited Defendants' version of these opening events, a full defense verdict would be warranted.

Earlier, in denying Defendants' initial motion for judgment as a matter of law, the Court had made clear that Plaintiff's case did *not* rise or fall on this initial encounter:

> The jurors could even reach the conclusion of excessive force if they believe the officers, that the officers identified themselves, punched him beside the head and then it went from there; some of which we could see, some of which we could not see. *That could still amount to excessive force,* especially when you factor in the tasing, the multiple tasing, and the punches and kicks. It was quite thorough, the takedown and the incessant punching and kicking. And so a jury could believe that that was excessive.

(ECF No. 145, Tr. 189:16–24 (emphasis added)).

Plaintiff and Officer Connair falling into a stack of food and soda. Officer Connair claimed he was "knocked down" into the boxes while "attempting to gain control" of Plaintiff. (*See* ECF No. 140, Tr. 133:18–138:25). Officer Johnson, also in frame, testified that he used his knee to strike Plaintiff's "common peroneal" (a nerve on the side of the knee), intending to cause Plaintiff to fall forward. (*See* ECF No. 141, Tr. 199:22–203:22). Officer Johnson asserted that this strike did not cause Plaintiff's fall; rather, Plaintiff "was tackling Connair and then fell over the chip rack." (*See id.*, Tr. 203:5–22). Plaintiff testified he was "slammed" or "pushed" into the chip rack, but he admittedly based this on the video, as his own recollection was unclear. (*See* ECF No. 145, Tr. 153:23–157:5). With respect to these uses of force, the video exhibit is ambiguous on whether Plaintiff "tackled" an Officer. It was not unreasonable for the jury to credit Defendants' account, so again the verdict must stand.

After a short gap, Mr. Woodson-Levey captured a second video that is four and a half minutes long (admitted as Joint Exhibit 2). Initially Plaintiff was on the ground, with Officers Johnson, Connair, and Everhart around him. A comment can be heard about "going to sleep." Though no Officer admitted to the statement, Officer Everhart confirmed he put Plaintiff in a headlock during this portion of the video. Officer Everhart explained that the headlock was intended to control Plaintiff and keep him on the ground, and that a proper headlock is distinct from a chokehold. (*See* ECF No. 141, Tr. 38:17–52:4). Officers Connair and Johnson confirmed that choking would be considered lethal force on CPD's continuum, which would not have been justified. (*See* ECF No. 140, Tr. 139:19–142:4; ECF No. 141, Tr. 197:3–198:8).

A few more seconds into the video, Officer Johnson delivered a series of four or five strikes to Plaintiff's back. (*See id.*, Tr. 199:5–12). Officer Johnson explained that, around this time, Plaintiff had grabbed Officer Johnson's hand and was "squeezing and twisting [his] fingers." (*See*

ECF No. 145, Tr. 221:24–223:18). Officer Johnson also claimed that Plaintiff bit him on the forearm, though he could not identify when this occurred on the video. (*See id.*, Tr. 222:12–23). Officer Connair testified to another attempted bite from Plaintiff, which he likewise could not place on the video. (*See* ECF No. 146, Tr. 113:15–25, 124:5–22).

Plaintiff then came to his feet, while his pants came down, exposing his bare genitalia. It is disputed whether Plaintiff stood on his own power or was lifted by an Officer. Viewing the video, Officer Connair stated "[i]t appears that Mr. Davis stood up." (ECF No. 140, Tr. 142:18–22). Officer Johnson similarly testified that Plaintiff "began to try to stand up with [Officer Johnson] on his back." (ECF No. 145, Tr. 221:24). Officers Everhart and Morefield were standing aside in the video and were not engaged directly with Plaintiff at that moment.

While Plaintiff briefly was on his feet, Officer Connair delivered a punch to Plaintiff's face with handcuffs in his hand. Officer Connair explained that he was grasping the hinge between the handcuffs and had no time to put them away. Officer Connair was confident that the metal did not contact Plaintiff's face, so he documented the force as level four ("hard empty hand control") rather than level five ("use of impact weapon") in his use-of-force report. (*See* ECF No. 140, Tr. 142:22–145:5, 152:20–159:6). For his part, Plaintiff did not have any conscious memory of the blow by Officer Connair. (*See* ECF No. 145, Tr. 115:19–23). The video then showed Plaintiff being taken back to the ground, surrounded by Officers.

With respect to these uses of force, the verdict must stand. From the Officers' testimony and the video evidence, the jury reasonably could have concluded that Plaintiff managed to stand up on his own power. Under that view of the video, force was necessary to bring Plaintiff back to the ground and avert his potential flight. The strike by Officer Connair is a closer call. Sergeant Joseph Johnson, who reviewed Plaintiff's arrest as part of an Internal Affairs investigation,

acknowledged that holding handcuffs, even inside the fist, would increase the forcefulness of the blow. Sergeant Johnson focused, however, on whether the handcuffs hit Plaintiff's face, for which he found insufficient evidence. (*See* ECF No. 144, Tr. 89:17–93:10). Sergeant Johnson conceded that Plaintiff had suffered a laceration between his eyebrows, which is where the handcuff would have made contact. (*See id.*, Tr. 102:20–103:3). Dr. Roy Taylor, a Chief of Police from North Carolina retained as Plaintiff's expert, regarded the strike as "inappropriate" and "excessive," even standing alone, since it would "increase the damage that a strike could do to somebody's face." (*See id.*, Tr. 170:3–171:1). Nevertheless, if the jury credited Officer Connair's testimony, the handcuffs were not used as an impact weapon, and it was not feasible for Officer Connair to put them away before delivering his strike. Given how the situation was evolving, with Plaintiff potentially rising to his feet, the Court cannot say it was "seriously erroneous" for the jury to resolve this conflicting evidence as it did. *Mitchell*, 440 F.3d at 303.

### 3. Final Stage – After Plaintiff is Pinned

For the final four minutes of Mr. Woodson-Levey's video, Plaintiff was on the ground surrounded by Officers—including uniformed backup Officers, who by then had arrived. The video did not give a complete view; Plaintiff's upper body was obscured by a rack of food, and Mr. Woodson-Levey briefly moved the camera so Plaintiff was out of frame. Generally, though, Plaintiff's lower body was visible. Officers' commands and blows were audible, as were Plaintiff's calls for help.

Officer Bennett, one of the uniformed backup Officers, was captured on the video administering 11 taser cycles, each lasting 5 seconds, while Plaintiff was on the ground. Officer Bennett testified that he applied both a "drive-stun" and a "close-quarter probe deployment," attempting to achieve pain compliance and neuromuscular incapacitation such that Plaintiff could

be "cuff[ed] under power." (*See* ECF No. 143, Tr. 96:21–99:18, 109:2–24). The data downloaded from Officer Bennett's taser (admitted as Joint Exhibit 6) showed that all 55 seconds of tasing were administered within a span of 1 minute, 28 seconds. The gap between cycles was as low as 1 second; the longest was 8 seconds, when the taser had to be reset. As justification for each additional taser cycle, Officer Bennett testified that Plaintiff was continuing active resistance, including "[n]ot providing his arms by holding them under his body, kicking his feet, bucking his body, [and] pushing up off the ground." (*See id.*, Tr. 118:21–135:21).

Meanwhile, multiple Officers testified they were using force to bring Plaintiff into a prone position. Officer Baker delivered "approximately seven to eight" knee strikes and punches to Plaintiff's left side (*see* ECF No. 141, Tr. 10:11–15:15); Officer Steele delivered seven strikes to Plaintiff's left and right shoulders (*see* ECF No. 142, Tr. 106:19–108:4); and Officer Reffitt delivered approximately nine kicks to Plaintiff's back, leg, and side (*see* ECF No. 143, Tr. 46:8–54:17). During the Internal Affairs investigation, Sergeant Johnson found Officer Reffitt's kicks to be unreasonable because "[a]t that time Mr. Davis was passively resisting and had multiple officers already on top of him." (*See* ECF No. 144, Tr. 123:10–126:15). This was the only use of force found to be out of policy. Officer Reffitt's chain of command, up to Deputy Chief Richard Bash, disagreed with the finding and exonerated Officer Reffitt on the grounds that Plaintiff's resistance was active. (*See id.*, Tr. 69:12–73:15).

The video showed Officers standing up, relaxed, around the 3:30 mark. Officer Connair testified that he and Officer Reffitt each had managed to place a handcuff on one of Plaintiff's hands, then they linked the two sets behind Plaintiff's back. (*See* ECF No. 146, Tr. 110:8–13). It is undisputed that all force ceased once Plaintiff was in handcuffs.

On these uses of force, the weight of the evidence is problematic. Once Plaintiff was pinned to the ground by four, five, and six Officers—versus two, earlier in the arrest—the risk of flight and ability to resist all but vanished. To borrow Defendants' recurring metaphor, Plaintiff was not "wrestling" at this point in the arrest. He was down for the count:

> Q. Did you ever like have the instinct to try to fight back?
>
> A. No, ma'am. The first punch really got me. So I was -- I couldn't even fight back if I wanted to. I couldn't. My arms -- like I guess when you boxing and when you're in the boxing ring and somebody pounding on you so much, you can't lift your arms. So the ref comes and stops the fight because they see you can't defend yourself anymore. That's the point I was at. I was at that point. I couldn't move. I couldn't lift my arms to do anything. I couldn't do anything.

(ECF No. 145, Tr. 115:9–18).

In opposing a new trial, Defendants attempt to create a credibility contest between themselves and Plaintiff. (*See* ECF No. 134 at 4–5). No such findings are necessary. Even giving full credence to Defendants' explanations, and minimal weight to Plaintiff's recollections, the jurors had enough objective evidence to assess the situation themselves. From that evidence, the jury should have concluded that the force utilized was greater than necessary. Through Dr. Taylor's testimony, Plaintiff established that 15 seconds of cumulative tasing is considered the limit by national research groups and the manufacturer itself, due to the danger of heart damage and ligament tearing. (*See* ECF No. 144, Tr. 154:15–155:3, 164:17–165:5). Plaintiff, however, received 55 seconds of tasing, concurrent with other uses of force. Sergeant Johnson testified he had *never* reviewed another case with more than 5 taser cycles, and he agreed it would be improper to utilize kicks, stomps, or knee strikes while an individual is being tased. (*See id.*, Tr. 117:10–119:12) (emphasis added). Furthermore, this force all occurred while Plaintiff was pinned. Commander Nicholas Konves, who reviewed the Internal Affairs investigation in Officer Reffitt's chain of command, estimated that "at least six" Officers were on top of Plaintiff, weighing

approximately 1,200 pounds. (ECF No. 148, Tr. 32:24–33:5). It would defy credulity to conclude these Officers were not in control.

Nonetheless, some Officers claimed Plaintiff was continuing physically to resist from the bottom of the pile. Officer Johnson claimed Plaintiff was "refusing to give [Officers] his hands" and was "yanking away from officers" as they attempted to handcuff him. (ECF No. 145, Tr. 227:7–19). Even if the jury gave full credit to these off-camera events, it was not reasonable to conclude that Plaintiff's mere refusal to move would justify the barrage of force to which he was subjected. Initially, Officer Reffitt claimed a more severe form of resistance, stating in his use-of-force report that Plaintiff had kicked him. However, Officer Reffitt walked this claim back after being confronted on the stand with his worker's compensation paperwork, which made no mention of any such kick. (*See* ECF No. 147, Tr. 175:2–176:20, 180:1–186:16 ("Q: This says nothing about Mr. Davis kicking you in the form you completed to have workers' compensation as a result of your interaction … on September 1st, 2017, correct? A: Correct.").

The force never relented to give Plaintiff a reasonable chance to comply. Plaintiff had as little as one second between Officer Bennett's taser cycles in which to regain control of his muscles and comply with commands. (*See* ECF No. 143, Tr. 159:2–160:12). Similarly, Officer Baker left Plaintiff less than one second between knee strikes in which to give up his hands. (*See* ECF No. 147, Tr. 158:6–159:14). Neither reported any allowance for Plaintiff's ability to move under 1,200 pounds of weight, nor for his dazed state after multiple taser cycles and prior blows to the head. Furthermore, several Defendant Officers evidently based their continued force on Plaintiff's involuntary reactions to other uses of force. Bucking, yanking, or tensing were natural reactions to being tased. CPD training, as reported by Officer Vehr, specifically covered the potential for involuntary muscle contractions and mental daze following a taser cycle. (*See* ECF No. 148, Tr.

195:15–198:17). Similarly, forming a protective posture around vital organs (not to mention, genitals) is how one naturally would brace for further blows and avoid being crushed against the market floor. Still, Defendant Officers concluded in as little as one second that Plaintiff was choosing to resist and that additional force was necessary.

To be certain, Defendant Officers had a legitimate law enforcement need to end the arrest and bring Plaintiff into custody. Initially, there was an appreciable risk that Plaintiff might flee or assault Officers—as Plaintiff allegedly had done in prior encounters with law enforcement, leading to his outstanding warrants. The problem is that the force used in the late stage of Plaintiff's arrest exceeded those needs, based on the clear weight of the evidence. There was no credible risk that Plaintiff could flee once he was pinned under four or more Officers. No Officer testified that Plaintiff was armed, nor that they believed he might be armed at that stage of the arrest. By their own accounts, Defendant Officers rested these late uses of force of Plaintiff's refusal to give himself up, not on the potentially assaultive behavior they described earlier in the arrest.

Defendants did not make a qualified immunity argument in briefing, though the issue did arise at trial. In any event, the jury could not reasonably have found for Defendants on this ground, either. When Plaintiff was arrested in 2017, reasonable Officers would have known "that 'the gratuitous or excessive use of a taser' violates a clearly established constitutional right." *Goodwin v. City of Painesville*, 781 F.3d 314, 327 (6th Cir. 2015) (quoting *Landis v. Baker*, 297 F. App'x 453, 463 (6th Cir. 2008)). For this reason, the *Goodwin* court affirmed a denial of qualified immunity where the Officer had "continued tasering [the subject] as he was obviously convulsing and powerless to respond to the officers' commands." *Id.* In *Kijowski v. City of Niles*, the court again took the view that rapid-succession taser cycles would not receive qualified immunity: "If the second shock actually followed on the heels of the first, the only tenable conclusion is that it

14

would have been impossible for [the subject] to muster any fight." 372 F. App'x 595, 600 (6th Cir. 2010). *See also Harmon v. Hamilton Cty.*, 675 F. App'x 532, 541 (6th Cir. 2017) ("Whether [the subject] was refusing to relinquish his right arm or whether he was unable to do so is material to determining whether the use of force employed by [the officer] was excessive."). Plaintiff argues that Defendants never gave him "time to comply with commands" amidst the many applications of force (ECF No. 129 at 7), and the trial evidence supported his position.

In *Rudlaff v. Gillispie*, a qualified immunity case more favorable to Defendants, the Sixth Circuit described a "simple dichotomy": "When a suspect actively resists arrest, the police can use a taser (or a knee strike) to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot." 791 F.3d 638, 642 (6th Cir. 2015). Defendants argued at length that *any* use of Plaintiff's muscles would qualify as active resistance. *Rudlaff* partially supports their claim—at least, if the refusal to move one's hands "is coupled with other acts of defiance." *Id.* at 641. Yet, even if Plaintiff's resistance is considered "active" in this sense, it would not unlock the full panoply of permissible force. Officer Vehr, Defendants' own expert, crafted a distinction between "a low level active resistance" and "aggressive active resistance . . . where now the suspect is assaulting the officer." (ECF No. 148, Tr. 117:5–18). Different force would be justified against a subject whose aggressive resistance "poses an immediate threat to the safety of the officers or others," *Graham v. Connor*, 490 U.S. 386, 396 (1989), versus one who is controlled but refuses to submit to cuffing. In fact, *Rudlaff* confirms that "the officers can use the amount of force *necessary* to ensure submission"—in that case, a "one-time taser shot and knee strike." 791 F.3d at 643 (emphasis added). Defendants' other choice case, *Williams v. Sandel*, involves a subject who was loose on a busy motorway, presenting a clear public safety risk. 433 F. App'x 353, 362–63 (6th Cir. 2011).

15

Here, reasonable Officers objectively would have known that 11 taser applications and tens of other blows, all in quick succession while Plaintiff was pinned to the ground and calling for help, violated Plaintiff's Fourth Amendment right to be free from excessive force. A reasonable verdict, aligned with the clear weight of the evidence, would have found the same.

### 4. Summary

The evidence in this case was disturbing. Defendants beat and electrocuted Plaintiff, very nearly to death, even though he was unarmed, outnumbered, and generally contained at the end of the arrest. Dr. Brian Mussio's pre-recorded video deposition, which Plaintiff played during trial, showed that Plaintiff was admitted to the hospital for acute renal failure, requiring days of treatment. Dr. Mussio explained that the toxins in Plaintiff's bloodstream were consistent with substantial trauma and breakdown of muscular tissue. Conceivably, the jury could have justified the initial uses of force while Officers attempted to take control of the situation. Yet, once Plaintiff was pinned to the floor by 1,200 pounds of weight, the force only intensified. Defendants were required to adapt their force to the situation before them, and the trial showed they did not. A complete defense verdict, therefore, was against the weight of the evidence. To allow the verdict to stand would be seriously erroneous—and a grave injustice.

Rule 59(a) expressly permits the Court to "grant a new trial on *some or all* of the issues." Fed. R. Civ. P. 59(a)(1) (emphasis added). "In deciding on the scope of a retrial, the court must consider whether 'it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice.'" *Yehia v. Rouge Steel Corp.*, 898 F.2d 1178, 1184 (6th Cir. 1990) (quoting *Gasoline Prods. v. Champlin Refining Co.*, 283 U.S. 494, 500 (1931)). Here, it is possible to separate the events in time, using the moment Plaintiff was pinned

16

to the ground as the dividing point. In the Court's judgment, a partial retrial affords due respect to the jury's findings, while avoiding the injustice of a complete defense verdict.

On retrial, all claims will remain viable against all Defendants, since no Defendant Officer ceased his force once Plaintiff went to the ground. This includes Plaintiff's *Monell* claims against the City of Columbus. The jury was instructed that it could not find against the City, on any *Monell* theory, unless it first found an underlying deprivation of constitutional rights. (Jury Instruction Nos. 24 & 25, adapted from 3B Fed. Jury Prac. & Instr. §§ 165:26 & 165:27 (6th ed.); *see* ECF No. 149, Tr. 118:23–120:21). *See also Thornton v. City of Columbus*, 727 F. App'x 829, 838 (6th Cir. 2018) (no municipal liability absent an underlying constitutional violation). Given the jury's verdict, it would not have reached the *Monell* claims. Defendants' opposition brief also rests on the jury's finding of no underlying violation; it makes no argument that the *Monell* portion of the verdict could stand independently. (*See* ECF No. 134 at 6–7). For clarity, the scope of permissible evidence also will not shrink. The force used in the early stages of the arrest, whether reasonable or not, is necessary context for the later stages. The difference will be in the jury instructions: for liability and damages, the new jury will consider only those applications of force occurring after Plaintiff was pinned.

## B.  Other Sources of Alleged Error

Plaintiff need not prevail on any other arguments. Still, for completeness, the Court has reviewed Plaintiff's remaining charges of error: (1) introduction of "harmful and highly prejudicial racial stereotypes" by Commander Meader and other defense witnesses; (2) improper expert testimony by Officer Vehr; (3) "multiple improper contacts and communications between Defendants and jurors"; and (4) "the failure of a juror to disclose the extent of his relationship with

family members in law enforcement." (ECF No. 129 at 9, 10, 12). None of these reasons, alone or in combination, would have supported a new trial.

### 1. Racial Stereotypes

The first of Plaintiff's remaining arguments is that "Defendants and Defendants' witnesses gave testimony that invoked harmful and highly prejudicial racial stereotypes against Plaintiff Timothy Davis, a Black man." (*Id.* at 9). Specifically, Plaintiff cites Commander Meader's testimony that "the black population, by statistics . . . disproportionately commit more crime." (ECF No. 142, Tr. 89:9–90:5; *see* ECF No. 129 at 10). Plaintiff also makes a general reference to testimony about his supposed "superhuman strength." (*Id.* at 9). Though the Motion does not cite specific instances, Plaintiff's reply brief discusses the testimony of Commander Konves and Sergeant Morefield as indicative of this stereotype. (ECF No. 138 at 5–6).

The full exchange with Commander Meader is set forth below:

Q. Before we get into that, I want to go back to this Matrix report which I was asking you before one of our sidebars. Are you aware that the Matrix report found a disparity between policing of black people and of white people?

A. I don't specifically recall that, but that would have validity.

Q. Do you believe that there is a disparity in the way that black populations and white populations are policed by the Division of Police in Columbus?

A. I don't think it's based on race. It's based on criminal behavior. Yes, I'm very aware that the statistics reveal that there's more force exacted upon the black population than the white population because the black population, by statistics, by -- as reported by victims, as reported by witnesses, disproportionately commit more crime. That would be reflected in the current year's homicide rate. It would be reflected in any previous year's homicide rate. And aggravated assaults, burglary, robbery, you break down any of those statistics and you're going to see a disproportionate number of black people that commit more crime than white people. So, ultimately, they're going to be arrested at a higher rate and there's going to be more force exacted.

(ECF No. 142, Tr. 89:9–90:5).

Plaintiff, citing a study by the Bureau of Justice Statistics,[4] clarifies that Black Americans "do not commit 'more' violent crime than white Americans," though Black Americans "are 'overrepresented' in violent crime arrest statistics for a variety of complex socioeconomic and historical reasons." (ECF No. 129 at 10). Nevertheless, Commander Meader's inaccuracy would not warrant a new trial. As Defendants note in their response brief, *Plaintiff* solicited this testimony by asking Commander Meader for an opinion. (ECF No. 134 at 8–10). Plaintiff did not object to the answer, nor did Plaintiff seek to clarify or impeach it. For those reasons, Defendants' arguments are well taken. Plaintiff cannot solicit testimony, decline to address it at trial, then claim the testimony rendered his trial fundamentally unfair.

Proceeding to Commander Konves, the following exchange occurred:

Q. What items did you think were important regarding making a determination of whether Mr. Davis was a threat to the safety of the officers or others?

A. There was a lot of things present in the investigation. There were multiple officers on scene and attempting to get him under control. And you've got six, fully grown men that are unable to get Mr. Davis into handcuffs for a significant amount of time. This was -- in my career, this was the longest fight that I had ever witnessed or seen, and that's to date.

Multiple uses of force that are ineffective. They just aren't doing what they're designed to do. We try to limit the amount of force we use. But these officers switched it up. We train if a technique doesn't work after a couple of times, try to switch it up, try something different. And everything these officers was trying was not working.

. . .

And he had bit an officer. He had picked up an officer that was six-three and 220 pounds on his back and slammed him into a door. That's not an easy feat to do. That was superhuman strength. He had thrown another officer into like a chip stand. And he was not responding to multiple verbal commands. All of these things are significant indicators. We had assaults on the officers. And then coupled with the

---

[4] *See* Allen J. Beck, *Race and Ethnicity of Violent Crime Offenders and Arrestees, 2018*, U.S. Dep't of Justice (Jan. 2021), available at https://bjs.ojp.gov/content/pub/pdf/revcoa18.pdf.

history, we know there was a history there of assaults on law enforcement. So all of that played a role.

(ECF No. 148, Tr. 20:12–21:17).

The Court soon called a sidebar, then instructed the jury to disregard the reference to Plaintiff's "superhuman strength":

> Ladies and gentlemen, I sustained the objection. I'm striking -- I'm having you disregard Commander Konves's testimony that Mr. Davis exhibited superhuman strength. There's no such thing as superhuman strength. And there has been a myth about black superhuman strength. Black superhuman strength does not exist, just as superhuman strength does not exist. I understand that might have been hyperbole. But it's hyperbole that deserves no place in the record or in your minds as you consider this case. Please continue.

(*Id.*, Tr. 23:22–24:5).

Defendants argue that a corrective instruction was the proper course (ECF No. 134 at 8), and the Court concurs. The Court "presume[s] that the jury followed this instruction, unless [it] conclude[s] that the evidence that was admitted was so prejudicial that [the movant] was deprived of a fair trial." *United States v. Newsom*, 452 F.3d 593, 604 (6th Cir. 2006) (internal citation omitted). Commander Konves's testimony, though improper, was corrected swiftly and emphatically. The Court cannot discern any "'overwhelming probability' that [the curative instruction was] ignored." *Scott v. Mitchell*, 209 F.3d 854, 879 (6th Cir. 2000) (quoting *Richardson v. Marsh*, 481 U.S. 200, 208 (1987)). As such, the testimony would not have warranted a new trial.

Lastly, the Court considers Sergeant Morefield's testimony. By Plaintiff's tally, Sergeant Morefield "described Mr. Davis as 'violent' at least twelve times during direct examination." (ECF No. 138 at 6). Sergeant Morefield also testified his force was ineffective against Plaintiff, and that he "'had never been in a struggle like this.'" (*Id.*). Plaintiff did not object to this testimony, and he admittedly "addressed many of these statements on cross-examination." (*Id.* at 6). While Sergeant Morefield's statements might be viewed as embodying insidious stereotypes, the statements were

neither as explicit nor as severe as the ones discussed previously. It was proper for Sergeant Morefield to testify about the arrest as he experienced it, and for Plaintiff to challenge that account on cross-examination. As such, Plaintiff's claim of prejudice is without merit.

### 2. Expert Testimony

Plaintiff also challenges the testimony of Officer Vehr, Defendants' use-of-force expert, as speculative and beyond the scope of his qualifications. (ECF No. 129 at 10–12). Plaintiff argues that Officer Vehr, who conducts training for CPD Officers, "has never evaluated any uses of force and has no training in how to do so," and that he "is not qualified to offer opinions as to *why* the defendant officers did or did not take certain actions." (*Id.* at 11–12).

Plaintiff also had challenged Officer Vehr's testimony *in limine*, arguing for exclusion under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). (*See* ECF No. 103 at 6–11). Plaintiff advanced three specific defects in Officer Vehr's report, which the Court summarized as follows: "(1) Vehr possessed an insufficient foundation for his opinion because he neglected to review the depositions and instead accepted the use-of-force investigations as true; (2) Vehr relied on certain studies on 'Action vs Reaction' that are inapplicable to Plaintiff's arrest and beyond the scope of Vehr's expertise; and (3) Vehr opined on legal issues that are properly decided by the jury." (ECF No. 118 at 5). The Court denied this motion and permitted Officer Vehr to testify "within [his] expertise in defensive tactics training," including on "the contents and conclusions of his report." (*Id.* at 6). Defendants argue that the Court properly ruled on these issues *in limine*. (ECF No. 134 at 12–13).[5] Plaintiff's reply brief makes no further mention of Officer Vehr's testimony, tacitly ceding the matter. (*See generally* ECF No. 138).

---

[5] Defendants also maintain that broader objections were not preserved at trial when Plaintiff merely "renew[ed] [his] objections in the motion in limine." (ECF No. 148, Tr. 103:15–16; *see* ECF No. 134 at 11–12). The Court need not reach this claim.

While the arguments in the present Motion differ slightly from those considered *in limine*, the prior reasoning stands. As CPD's defensive tactics trainer, Officer Vehr was qualified by "knowledge, skill, experience, training, or education," Fed. R. Evid. 702, to opine on the various uses of force through the lens of CPD policy. Officer Vehr has taught that very policy to recruits and in-service Officers for about six years, and he holds multiple instructor certifications. (*See* ECF No. 148, Tr. 99:20–103:3). Further, there is a subtle yet critical distinction between claiming to know Defendants' internal thought processes, which is an exercise in omniscience, and offering an opinion on whether Defendants' actions were reasonable and consistent with their use-of-force training. Officer Vehr's testimony fell under the latter, which again was within his competency.

"Reversal based on improper admission of evidence is appropriate only when the admission interfered with substantial justice." *Morganroth & Morganroth v. DeLorean*, 123 F.3d 374, 382 (6th Cir. 1997). The Court is not persuaded that Officer Vehr's testimony was admitted improperly here, nor that justice was disserved. Like the Court held *in limine*, the proper response to Officer Vehr's testimony was a competing expert and probing cross-examination, both of which Plaintiff supplied. As such, the alleged deficiencies in Officer Vehr's expert testimony would not have warranted a new trial.

### 3. *Juror Contacts*

Next, Plaintiff raises the "improper contacts and communications between Defendants and jurors." (ECF No. 129 at 12). Three incidents underlie this claim, and the first two relate to the same juror. First, court personnel witnessed Juror #2 making eye contact and exchanging nods with one of the Defendants, Officer Baker, around the time of closing arguments and jury deliberation. (*Id.* at 13). Later, it was adduced that Juror #2 also made a "one-line joke" with a group of Defendant Officers in the public restroom. (*Id.* at 14). In response, Defendants argue that

neither the "casual comment in passing," nor the "passive and unmemorable gestures of alleged acknowledgement towards the Defendants," suggests the juror's decision-making was affected by outside information or bias. (ECF No. 134 at 13–14).

Without any further information, the friendly nonverbal interactions between the juror and Officer Baker plausibly could have been interpreted as communicating Juror #2's view of the case, revealing a preexisting bias, or both. When the Court was alerted to this possibility of bias or misconduct, "a duty to investigate" was triggered. *United States v. Shackelford*, 777 F.2d 1141, 1145 (6th Cir. 1985). The Court substantiated Juror #2's nonverbal nods with Officer Baker, alerted the parties, and authorized a hearing pursuant to *Remmer v. United States*, 347 U.S. 227 (1954).[6] This "*Remmer* hearing" occurred on January 13, 2022. Juror #2 testified at the hearing and offered satisfactory explanations for each alleged contact. Juror #2 stated that he is "personable," generally "tr[ies] to look everybody in the eye," and "would nod to anybody . . . just to acknowledge folks were there." (ECF No. 128, Tr. 23:20–24:8). The verbal contact in the restroom was discovered during Juror #2's testimony. The juror explained, though, that the "one-line joke" was simple, juvenile humor, and that no substantive information was exchanged. (*Id.*, Tr. 22:20–23:19).[7]

Because the burden of proof rests squarely with the party seeking a new trial, Juror #2's testimony about his own impartiality "is not inherently suspect." *United States v. Zelinka*, 862 F.2d 92, 95–96 (6th Cir. 1988); *see also United States v. Pennell*, 737 F.2d 521, 531–33 (6th Cir. 1984) (discussing abrogation of the former "presumptive prejudice" standard). Nothing else adduced at the hearing cast any doubt on the truthfulness of Juror #2's explanations. Tellingly, Plaintiff

---

[6] *See also Cunningham v. Shoop*, 23 F.4th 636, 648–49 (6th Cir. 2022) (discussing *Remmer* hearing procedure in this Circuit); *Krause v. Rhodes*, 570 F.2d 563, 567–68 (6th Cir. 1977) (applying *Remmer* in civil context).

[7] Juror #2 was in the public restroom, rather than the separate juror restroom, when he encountered the Officers.

abandons any reference to Juror #2 in his reply brief (*see generally* ECF No. 138), a tacit concession that these claims would not support a new trial.

The final contact was Sergeant Morefield's verbal "outburst" in open court, made during Plaintiff's closing arguments. (ECF No. 129 at 14–15). As Plaintiff's counsel recounted testimony about prior discipline, intended to impeach the Sergeant's credibility, Sergeant Morefield interjected: "It's not true." (ECF No. 149, Tr. 32:19–22). The Court has little doubt jurors heard the comment. It was audible to court personnel and spectators in the gallery, and it was included in the official trial transcript.

By Plaintiff's account, this comment "was made with the clear intent of communicating to the jury and influencing the jury's deliberations." (ECF No. 129 at 15). Even if it was so intended, the Court issued a strong corrective instruction, first to Sergeant Morefield (ECF No. 149, Tr. 49:5–51:6), then in the presence of the full jury:

> Thank you for your patience, ladies and gentlemen. It is unfortunate that I must address a matter with you.
>
> During the closing argument of Ms. Gelsomino, when she was speaking of Officer Morefield having catfished to get Mr. Davis to the market, Officer Morefield, most inappropriately, said out loud, as several in the audience and my court reporter heard: Not true. This was inappropriate. His statements -- or his statement in this context is not evidence in this case . . . .
>
> You must disregard that statement and any other statement that a defendant would make, or a plaintiff would make, in this courtroom unless he or she is testifying as a witness. And so I instruct you on the strongest terms I can that you are to disregard those kinds of random and inappropriate statements. It was not proper, and I believe that someone with Officer Morefield's level of experience and training as a sergeant would tell him that such was not proper in a lawsuit. I will not allow it in this case.

(*Id.*, Tr. 51:9–52:3).

The Court considered the possibility of a mistrial and cautioned all counsel that it would entertain such a motion *if* the disruptive behavior continued. (*See id.*, Tr. 46:4–8). For a singular

"outburst," though, the Court determined that a curative instruction was the appropriate remedy. Such instructions are "presume[d] to have been effective unless there is an 'overwhelming probability' that they were ignored." *Scott*, 209 F.3d at 879 (quoting *Richardson*, 481 U.S. at 208). Plaintiff's allegations of prejudice do not overcome this presumption. Therefore, the Court remains satisfied that a curative instruction, rather than a new trial, was the appropriate response to Sergeant Morefield's comment.

### 4. *Voir Dire*

Plaintiff's last charge of error is that Juror #2—the same juror who testified at the *Remmer* hearing—"failed to disclose during *voir dire* that his grandfather was an elected sheriff in Knox County." (ECF No. 129 at 16–17). Juror #2 clarified at the *Remmer* hearing that he has two relatives in law enforcement: a niece in CPD, and a grandfather (now deceased) who had served as the elected Knox County Sheriff for approximately 24 years. (ECF No. 128, Tr. 8:23–9:7, 10:21–11:9).

In his juror questionnaire, submitted prior to *voir dire*, Juror #2 listed his grandfather in response to the following question: "Have you, a member of your family, or any other person you regard as important to you . . . been a member/employee of any law enforcement agency?"[8] Juror #2 omitted his niece from the questionnaire. At *voir dire*, the Court asked: "Is there anyone with relatives or close personal friends who are or have been employed by the Columbus Police Department?" Juror #2 responded by disclosing his niece, and he affirmed his ability to be impartial. Later, the Court asked: "Other than the individuals we've heard from, is there anyone with relatives who are in law enforcement? . . . I'm not limiting it now to Columbus, but relatives in law enforcement." Juror #2 did not respond to this question.

---

[8] The completed juror questionnaire is on file with the Court.

Had Juror #2 shared information about his grandfather at *voir dire*, it likely would have prompted follow-up questioning. At the *Remmer* hearing, Juror #2 discussed the formative role his grandfather played in his childhood. Juror #2 lived next door to his grandfather, spent many after-school hours at the jail, and "admired" his grandfather as "a good role model." (*See* ECF No. 128, Tr. 9:13–13:6). Juror #2 agreed with the statement, offered by Plaintiff's counsel, that his relationship with his grandfather "formed beliefs and views that [he] had regarding law enforcement at those young ages." (*Id.*, Tr. 13:3–6). In hindsight, Plaintiff argues "it is extremely likely that Plaintiff would have struck [Juror #2] from the jury pool for cause, or at least exercised a peremptory challenge to his participation on the jury." (ECF No. 129 at 17).

Defendants respond that Plaintiff had all necessary information at his disposal. (ECF No. 134 at 16). This is accurate. Standing alone, neither the questionnaire nor the *voir dire* response was complete; but together, they disclosed both the niece and the grandfather as relatives in law enforcement. Plaintiff had the juror questionnaire in advance and could have used it to inquire further about the juror's relationship with his grandfather.

Another point, overlooked in the briefing, is that the Court's question at *voir dire* did not necessarily call for Juror #2 to disclose his grandfather. On review of the transcript, the Court phrased its question in the present tense ("relatives who *are* in law enforcement"), and Juror #2's grandfather passed away long ago. The Court also excluded "individuals we've heard from"— intending to avoid repetitive answers about relatives in CPD—which may have led Juror #2 to conclude he should not answer again. (*See* ECF No. 128, Tr. 9:1–5). Nor did Plaintiff ask any question that clearly called for Juror #2 to respond. After calling on specific jurors about their relationship to law enforcement, Plaintiff posed a catch-all question: "does anybody feel that . . . maybe this wouldn't be the right case for you based on that set of circumstances?" By this point,

Juror #2 already had affirmed his ability to be impartial. Perhaps Juror #2 should have erred on the side of full disclosure, but it is a stretch for Plaintiff to claim the answers were "willfully evasive or knowingly untrue." *Clark v. United States*, 289 U.S. 1, 11 (1933) (quoted, ECF No. 129 at 17).

To obtain a new trial based on concealment at *voir dire*, "a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984); *see also English v. Berghuis*, 900 F.3d 804, 813 (6th Cir. 2018). Importantly, not all omissions will rise to this level.

> To invalidate the result of a three-week trial because of a juror's mistaken, though honest response to a question, is to insist on something closer to perfection than our judicial system can be expected to give. A trial represents an important investment of private and social resources, and it ill serves the important end of finality to wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on *voir dire* examination.

*McDonough Power*, 464 U.S. at 555.

Under the circumstances, the Court is satisfied that any omission in Juror #2's *voir dire* was harmless error. The Court cannot conclude Juror #2 was dishonest and intentional, nor that a challenge for cause would have been warranted. Between *voir dire* and the questionnaire, Juror #2 disclosed both relatives in law enforcement. He also affirmed at *voir dire* that he could serve as an impartial arbiter. A new trial is not required merely because Plaintiff neglected to inquire further or to use a peremptory strike.

## IV. CONCLUSION

For the reasons stated above, Plaintiff's Motion for a New Trial (ECF No. 129) is **GRANTED IN PART** and **DENIED IN PART.** Though the jury's verdict clears the threshold of reasonableness as to certain uses of force, a complete defense verdict is against the clear weight of

the evidence adduced at trial. On that basis, and no other, Plaintiff is entitled to a partial new trial

pursuant to Fed. R. Civ. P. 59(a). Plaintiff may recontest Defendant Officers' uses of force after

they had pinned Plaintiff to the ground, as well as municipal liability for the same. A new trial

order will issue under separate cover.

        **IT IS SO ORDERED.**

_____

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATED: September 19, 2022**